UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CHERYL BISHOP, | No. |
| Plaintiff, | COMPLAINT |
| v. | |
| JEFF SESSIONS, ATTORNEY GENERAL, DEPARTMENT OF JUSTICE, ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, | |
| Defendants. | |

Plaintiff Cheryl Bishop alleges as follows:

## I.    NATURE OF CASE

1.1    This is an action for damages, and declaratory and injunctive relief to remedy racial harassment, discrimination, and retaliation that the government has and is committing against ATF Supervisor Cheryl Bishop.  She brings this action under Title VII of the Civil Rights Act of 1964.

## II.    ADMINISTRATIVE EXHAUSTION

2.1    Plaintiff filed her formal individual complaint with the Defendant more than 180 days ago, which was assigned to an administrative judge of the EEOC for hearing.  No hearing has been scheduled.  An appeal has not been filed and a final action has not been taken, so Plaintiff has the right to file this civil action in court.[1]

---

[1] Plaintiff recently filed a formal EEO Complaint with Defendant alleging continued retaliation, harassment, and discrimination that is closely related to the allegations in this lawsuit, but the Agency refused to stipulate to consolidation of the two matters.  Accordingly, once the

COMPLAINT - 1

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ld241101

### III.   JURISDICTION AND VENUE

3.1    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

3.2    The Court has personal jurisdiction over Defendant within the Western District of Washington.

3.3    Venue is proper in the Western District of Washington because a substantial part of the events complained of occurred in this District, the Plaintiff resides in this District, and the Plaintiff is assigned by Defendant to perform her duties for the Defendant in its offices located in this District. *See* 28 U.S.C. § 1391.

### IV.   PARTIES

4.1    Plaintiff Cheryl Bishop is an individual residing in Seattle, WA.  She is African-American.  Since July 2013, she was a Senior Special Agent (SA) Explosives Detection Canine Handler, Bureau of ATF, until being promoted to Supervisor during the course of this litigation.

4.2    Defendant Jeff Sessions is the Attorney General of the United States, who is the appropriate "head" of the Department of Justice and its constituent federal agency, Alcohol Tobacco Firearms and Explosives (ATF) that employed Plaintiff, and therefore is the proper Defendant in this action, under 42 U.S.C. § 2000e-16(c).  Defendant is an employer within the meaning of Title VII.

### V.   FACTS

5.1    On April 5, 2016, during a Seattle Field Division All-Hands Meeting, ATF Deputy Director (DD) Ronald Turk publically praised then-Special Agent Cheryl Bishop for her work as a Special Agent and as a canine handler and personally issued her a special memorabilia Challenge Coin from the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Office of the Deputy Director.

---

regulations permit Plaintiff to file a civil action on her supplemental allegations she will move to add them to this civil action.

COMPLAINT - 2

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ld241101

5.2     After the all-hands meeting in Seattle, Agent Bishop asked DD Turk for advice about the best avenue for her to contribute to the Agency while advancing her career.  She told DD Turk that she was age 52, but with her experience in ATF and in the private sector at Amazon.com, she said she has a lot to offer the Agency before she reaches the mandatory retirement age of 57.  DD Turk responded that at that point in her career he recommended a one-year detail in ATF Headquarters (HQ) to complete the requirement for HQ time prior to promoting to grade GS15.  DD Turk said she could even reach Senior Executive Service (SES) pay grade.  DD Turk stated he would inquire about what one-year detail opportunities were available at HQ for her.

5.3     DD Turk did so.  The next day, he wrote an email (dated April 7, 2016) to two of his direct reports, Assistant Director (AD) Michael Gleysteen and Assistant Director (AD) Roger Beasley, asking if they know of a place for her to perform an HQ detail.  DD Turk wrote to them that she was a "senior agent with some unique background looking for a TDY to HQ.  She left ATF for the private sector and eventually came back for good reasons… [Assistant Special Agent in Charge] ASAC Nunez recommends her and said [Special Agent in Charge] SAC does too."

5.4     That same day, AD Gleysteen then sent an email to his subordinate, Assistant Special Agent in Charge (ASAC) Charlie Patterson, who contacted his subordinate, Donald Robinson, who contacted his subordinate, John Ryan (who oversees the Canine program nationwide), asking about HQ opportunities for Agent Bishop and about her duty to the Canine Division as a canine handler.

5.5     The next day, April 8, 2016, ASAC Patterson wrote to AD Gleysteen, "As it stands SA Bishop has a two-year K9 commitment left, however Don and his staff are willing to work with her in the event she was able to identify a TDY in HQ.  Because she has been with her partner for so long now, we would not recommend separating the two."  AD Gleysteen then sent an email to AD Beasley, who had expressed an interest in hiring SA Bishop: "If you want to reach out to this employee feel free.  We will work out the K-9 issue on the backend if you select

COMPLAINT - 3

her." AD Beasley wrote back: "So does that mean she would bring the K-9? Never thought OST would have one but I do love dogs!" AD Gleysteen replied: "If you love dogs please consider it yours!"

5.6     A couple of weeks later, Agent Bishop spoke with Office of Science and Technology (OST) AD Beasley, who offered Agent Bishop a one-year promotional detail to work for him. In essence, her responsibilities would be to educate the OST about the needs and practices of agents in the field and serve as a liaison between the OST and the operations side of the Agency. After the conclusion of her promotional detail, Agent Bishop would return to Seattle and resume her role as a canine handler with her canine "Allegra." AD Beasley explained to Agent Bishop that he had spoken with AD Gleysteen, who said he had looked into her bringing her canine to OST for the promotional detail and that Gleysteen approved whatever Beasley wanted and that she could bring her canine, Allegra, and maintain her ATF canine certification for that year. Agent Bishop contemporaneously recorded these communications from AD Beasley in an email that she wrote to her ASAC, Celinez Nunez, on April 22, 2016.

5.7     A few days later, on April 26 and April 29, AD Beasley and AD Gleysteen exchanged emails, in which AD Gleysteen stated, "This TDY has our full support." AD Beasley confirmed via email that Agent Bishop's SAC, Doug Dawson, "was very supportive" and he planned for Agent Bishop to start her one year promotional detail to HQ "in July," to which AD Gleysteen replied: "Perfect!"

5.8     During this time, SAC Boxler of the Washington, D.C. Field Division learned that Agent Bishop would be on detail in HQ. He then contacted AD Beasley and offered that anytime SAC Boxler's Washington Office had need of a detection canine that Agent Bishop was welcome to participate.

5.9     During the week of April 25, 2016, while they were in San Diego, California, for canine recertification testing, SAC John Ryan and Program Manager Chief Raphael Martinez—both of the National Canine Division—told Agent Bishop they had heard about her temporary one-year detail to HQ. They congratulated her, offered their support, and stated that while she

COMPLAINT - 4

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604 Fax 206.343.3961

11256.01 ld241101

1   was on detail at HQ she was welcome to come train with her canine Allegra anytime at the

2   national canine facility in Front Royal, Virginia. Agent Bishop thanked them, and told them that

3   she would be working for AD Beasley of the Office of Science and Technology.  She also told

4   them that AD Beasley had explained to her that SAC Boxler offered that anytime the

5   Washington Office had need of a detection canine she was welcome to participate.  She told

6   them she was excited about the HQ detail, and that AD Beasley had said he was fully supportive

7   of her assisting the Washington Field Division in D.C. with her canine whenever she wanted.

8   Ryan and Martinez expressed no reservations or concerns regarding what the detail entailed or

9   with her canine remaining in-service.

10          **Racism Rears its Ugly Head**

11          5.10    In late April 2016, as Agent Bishop was planning to leave Seattle for her one-year

12   detail in Washington D.C., Agent Bishop was asked to serve as an acting Group Supervisor in

13   the Eugene, Oregon ATF office substituting for Group Supervisor (GS) Brad Devlin—who was

14   being considered for a promotion to ATF Internal Affairs.  To sabotage Agent Bishop, GS

15   Devlin made damaging and disparaging remarks about her to the ATF agents she would be

16   supervising in Eugene and to Assistant United States Attorneys in Oregon who she needed to

17   work with to perform her job as Group Supervisor there.  Devlin told them that Agent Bishop

18   lacked the professional qualifications needed and that she would be a "train wreck."  GS Devlin

19   has admitted under oath that he made these remarks about Agent Bishop.

20          5.11    This was only the most recent racial harassment and discrimination of Agent

21   Bishop, who is African-American, by GS Devlin, who is Caucasian, but it was the first

22   opportunity that GS Devlin had in quite some time to continue abusing her.  During previous

23   years, GS Devlin had directly supervised Agent Bishop in Seattle.  During that time, and from

24   2009 through 2012, GS Devlin repeatedly committed racial harassment and discrimination

25   against Agent Bishop, which the Agency ignored and failed to stop.  For example:

26          5.11.1 On January 20, 2009, Agent Bishop raised a concern to GS Devlin that she

27   had not been given her bullet-proof vest.  Ignoring her stated concern, GS Devlin assigned her to

COMPLAINT - 5

11256.01 le181104

1   assist and cover a law enforcement operation thereby putting her life in danger without adequate

2   and required protective gear.

3        5.11.2  The next month, on February 19, 2009, GS Devlin sent an email explicitly

4   disparaging African-Americans regarding an African-American ASAC to a group of ATF agents,

5   including to SA Bishop and local law enforcement officers.

6        5.11.3  On the same day, GS Devlin arranged for a presentation to a new Special

7   Agent in Charge (SAC) about a Special Response Team (SRT) warrant and operation.  He

8   invited all ATF and Task Force Officers in the group to attend, but he excluded Agent Bishop.

9   All the other agents and task force officers in the group that he invited were white males (ATF

10  SA Ken Cooper, ATF SA Craig Howe, and ATF-King County Task Force Officer Mike Garske).

11  ATF Group Supervisor Douglas Krogh witnessed this.  GS Devlin did not inform Agent Bishop

12  of the presentation.  Instead, after sitting on a project of developing an operational plan until the

13  last minute, he then assigned SA Bishop to handle it during the presentation as an excuse so she

14  would be unavailable to attend.

15       5.11.4  GS Devlin sent multiple emails to ATF agents under his supervision,

16  including Agent Bishop, mocking African-Americans, including Barack Obama—while Obama

17  was Commander in Chief and President of the United States.

18       5.11.5  GS Devlin wears a large Nazi-SS tattoo on his shoulder that he claims to

19  have obtained for working undercover in a white supremacist gang several years ago.  He has

20  declined to have it removed at ATF expense and showed it off publically to other ATF agents in

21  front of Agent Bishop while eying her with a grin.

22       5.11.6  Without provocation, when Agent Bishop asked GS Devlin a question

23  while in his office, GS Devlin walked up to Agent Bishop, yelled at her to her face, and raised

24  his fist towards her as if to hit her while refusing to answer her work-related question.

25      5.12   Agent Bishop reported GS Devlin's racist conduct to her superiors, but they took

26  no action. In 2009, she reported them to GS Devlin's supervisor, ASAC Robert Levingston, who

27  claimed he spoke to GS Devlin about the physical threat and to ASAC Charlie Smith and SAC

COMPLAINT - 6

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ld241101

1    Kelvin Crenshaw about GS Devlin's display of his offensive white supremacist tattoo.  But the

2    Agency did not investigate further, report the incidents, or take any action.  During 2016, Agent

3    Bishop spoke more than once with ATF Budget Analyst (BA) Linda Gathercole about

4    Supervisor Devlin's discriminatory and harassing behavior.  Likewise, during and before 2016,

5    Agent Bishop spoke on more than one occasion with Division Operations Officer (DOO) Casey

6    Xiong about GS Devlin's discriminatory and harassing behavior.  And in several conversations

7    with ASAC Celinez Nunez, Agent Bishop had described the history and pattern of GS Devlin

8    committing incidents of racial harassment and discrimination.

9        5.13    Despite ATF's knowledge that Group Supervisor Brad Devlin has engaged in

10    discriminatory behavior and racial harassment and brings racist attitudes to work, the Agency

11    repeatedly looked the other way.

12        5.14    In April 2016, a colleague in the Portland, Oregon ATF office, GS Colleen

13    Domenech, reported to Agent Bishop that GS Devlin was sabotaging her to other agents and the

14    U.S. Attorneys.  In response, Agent Bishop emailed GS Devlin asking him to stop.  In response,

15    he claimed to "have no idea what you are talking about" and that he has "not disparaged you to

16    anyone."  But he admitted that he had expressed his opinion of her, when asked by others.

17        5.15    Deeply troubled that GS Devlin was undermining her reputation and authority

18    within the agency and to the U.S. Attorney's Office where she would be stationed, Agent Bishop

19    told her superior, ASAC Nunez, about GS Devlin's misconduct.  And, on April 21, 2016, Agent

20    Bishop forwarded to ASAC Nunez her email exchanges with GS Devlin.  That same day, ASAC

21    Nunez forwarded the emails to SAC Dawson and discussed the issue with him because, Nunez

22    wrote, "I will need to address it."

23        5.16    On May 2, 2016, Agent Bishop again met with ASAC Nunez.  ASAC Nunez told

24    Agent Bishop that she had a "candid" conversation with Group Supervisor Devlin about his

25    recent disparaging comments about Agent Bishop.  But ASAC Nunez made no mention of the

26    ATF investigating or disciplining him for his misconduct, or taking any action at all.  ASAC

27    Nunez asked Agent Bishop, "would it make you feel better if I wrote a letter for his file?"

COMPLAINT - 7

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ld241101

1    ASAC Nunez said, "You know, he will probably just wipe his ass with it."  ASAC Nunez said

2    that if Agent Bishop "felt strongly about it" and "if it would make you feel better" to have ASAC

3    Nunez put something in Devlin's file then Agent Bishop was welcome to send ASAC Nunez

4    something in writing and include any relevant documents.  ASAC Nunez told Agent Bishop that

5    it was "too bad previous managers did not handle the situation" with Devlin.

6         5.17    In response, the following day, in a memorandum dated May 3, 2016, Agent

7    Bishop reported to her ATF Seattle Field Division Management, ASAC Celinez Nunez and SAC

8    Douglas Dawson, that ATF Group Supervisor Brad Devlin had racially harassed and

9    discriminated against her.  Exhibit A is a true copy of her May 3, 2016 memo.

10        5.18    The next day, May 4, 2016, Agent Bishop saw SAC Dawson standing outside the

11   door of his office.  She asked to speak with him to discuss her complaint memo dated May 3,

12   2016, so that he could hear directly from her why she had written it. SAC Dawson invited Agent

13   Bishop into his office and they talked about her concerns and the incidents reported in her memo.

14   It was apparent from his behavior and remarks that SAC Dawson was familiar with the contents

15   of her memo. Agent Bishop talked to SAC Dawson about incidents outlined in her memo and

16   how emotionally painful and tiring it had been for her dealing with Devlin's abusive behavior

17   over the years and that ATF never took action to stop it.  She told SAC Dawson that the latest

18   incidents in which Devlin had been harassing her was completely unprofessional, and that he had

19   not only defamed and bad-mouthed her *inside* the Agency but also had inflicted harm by

20   defaming her to others *outside* the agency, which might interfere with her ability to perform her

21   job effectively.  SAC Dawson said he agreed that Devlin had probably harmed her professional

22   reputation.  SAC Dawson then told her that he was the class coordinator when Devlin was a new

23   hire at the academy.  SAC Dawson told her that Devlin "had issues" even then and stated

24   "Devlin has always been a separatist" racially.

25        5.19    On or about May 5, 2016, Agent Bishop was speaking with ASAC Nunez just

26   outside the door of ASAC Nunez's office about Bishop's May 3, 2016 complaint memo.  ASAC

27   Nunez said that SAC Dawson had told her, "Devlin does not like black people."

COMPLAINT - 8

5.20    The next day, May 6, 2016, ASAC Nunez and SAC Dawson spoke to GS Devlin, who confirmed that he wears a "German Eagle SS lightning bolt tattoo" that he received to work undercover with a white supremacist organization.

**The HQ Promotional Detail**

5.21    Meanwhile, Office of Science and Technology (OST) continued to prepare for Agent Bishop's arrival at HQ, with her canine.  OST Program Manager Thomas Stewart wrote her an email dated May 26, 2016 asking "What training requirements will you need to meet during your detail to HQ" and whether "there are any training requirements for your canine duties?  I know there are periodic recertifications, as our Lab is often involved in these."

5.22    That same day, Agent Bishop responded via email, "I have been in touch with the Chief of National Canine Division in Front Royal.  They offer several opportunities for RECERT testing during a FY-including at Front Royal-so next year[']s RECERT will not be a problem." She explained that she would be traveling in her "K9 GOV" with her "K9 equipment."  Agent Bishop cc'd her immediate supervisor in Seattle, and her ASAC, Celinez Nunez, on her message.

5.23    A few days later, ATF OST sent a Memorandum of Understanding (MOU) describing Agent Bishop's one-year promotional detail to HQ, including that she would be paid as a GS-14—a temporary promotion to supervisor status from her GS-13 status as a canine handler.  OST Chief Thomas Hill signed the MOU, and the Agency forwarded it via email by OST Program Manager Tom Stewart to Agent Bishop who signed and returned the MOU to HQ. Exhibit B is a true copy of the signed MOU.

5.24    On or about June 9, 2016, National Canine Division Program Manager Raphael Martinez called Agent Bishop and told her that the Agency had decided that she cannot take her canine on her approved promotional detail with OST in HQ so must permanently retire Allegra. Shocked, Agent Bishop asked why the Agency had changed its mind after approving her taking her canine.  But Martinez did not explain; he just said the order came from Headquarters.

COMPLAINT - 9

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 ld241101

5.25     In response, Agent Bishop notified ASAC Nunez of what Chief Martinez had told her. ASAC Nunez replied that the new decision that she could not bring Allegra was contrary to what had been agreed. ASAC Nunez said she would look into what had happened.

5.26     A few days later, on June 14, 2016, ASAC Nunez told Agent Bishop that according to SAC Dawson: if Agent Bishop went on the HQ detail, the Agency would retire Allegra so upon finishing her promotional detail, Agent Bishop would then have to start over by repeating the sixteen-week K9 course and signing a new 5-year K9 commitment agreement through her retirement. This would prevent Agent Bishop from advancing in her career.

5.27     The following day, June 15, 2016, ASAC Nunez wrote an email directly to SAC Dawson about "HQ's decision not to allow K9 Allegra to go on a one year TDY and remain in service.... I did not think this would be an issue, especially when she was told from the inception of this TDY proposal that she could keep K9 Allegra in service. [I]n light of this being the 11[th] hour of this news, I think we owe it to SACH Bishop to make some concessions to this new rule."

5.28     A day later, June 16, 2016, ASAC Nunez told Agent Bishop that SAC Dawson and AD Gleysteen had denied all requests for concessions to the new conditions imposed on her promotional detail.

5.29     Later that week, on June 19, 2017, ASAC Nunez sent a text message to Agent Bishop stating that SAC Dawson had added an additional condition to her detail: upon returning from HQ she would have to relocate to Portland, Oregon. This would require Agent Bishop to have frequent interaction with GS Devlin, and to face the prospect of him periodically supervising her.

5.30     A few days later, Agent Bishop called AD Beasley and explained the new conditions that the Agency was imposing on her if she went on the HQ detail in his office. AD Beasley expressed great surprise at this news. He stated that the Canine Division, AD Gleysteen, SAC Dawson, and others had all been supportive of her maintaining her canine during the promotional detail so the decision that she could not bring Allegra "does not make any sense."

COMPLAINT - 10

1   He said the new conditions were not what was agreed to, and that he would confer with AD

2   Gleysteen.

3       5.31    On June 29, 2016, after a call from ASAC Nunez stating that SAC Dawson needs

4   an answer to whether she is moving forward with the promotional detail in light of the new

5   conditions, Agent Bishop emailed AD Beasley asking if he had conferred with AD Gleysteen.

6   AD Beasley responded that he had, and that AD Gleysteen had said he promised to look into the

7   issue.

8       5.32    That same day, ASAC Nunez called back and stated that AD Gleysteen and SAC

9   Dawson insisted Agent Bishop decide immediately.  Accordingly, the following day, June 30,

10   2016, Agent Bishop notified AD Beasley via email that under the circumstances she had decided

11   against taking the HQ detail in his office.

12       5.33    The Agency's asserted non-discriminatory and retaliatory reason for undermining

13   Agent Bishop's promotional detail has changed several times.  ASAC Nunez first told Agent

14   Bishop that ATF management did not want "Lazy Canine Handlers to go on details thinking that

15   they could collect per diem.  But, I'm not talking about you," or words to that effect.  ASAC

16   Nunez later told Agent Bishop that the Agency "does not want to set a precedent," or words to

17   that effect.  Finally, in yet another conversation, ASAC Nunez told Agent Bishop that it "is

18   impossible to do both because the dog must work," or words to that effect.

19       5.34    During litigation before the EEOC, the Agency settled on the last of its

20   explanations, asserting that managing a canine for the ATF is a full-time job so it would have

21   been impossible for Agent Bishop to maintain her canine at operational proficiency while

22   working for OST at Headquarters.

23       5.35    The Agency's assertion is not true.

24       5.36    ATF has no policies, procedures, memoranda, reports, training materials,

25   PowerPoint presentations, or any other documentation that reflects the Agency's assertion.

26       5.37    The Agency's position is likewise undermined by its decision to knowingly assign

27   a white canine handler who had no history of protected EEO activity, Agent Scott Dvorak, to

COMPLAINT - 11

1  serve as the Special Agent On the Job Training (OJT) Instructor to new Special Agents, while

2  maintaining his canine as a canine handler.  The OJT's responsibilities include training new

3  agents hired by ATF, which the Agency admits takes an average of "6-8 hours a day, depending

4  on the workflow of the office."  Thus, the Agency has admitted that it assigned to comparator

5  Dvorak, who is white and has not engaged in protected activity, a full time job as OJT while

6  allowing him to maintain his canine certification and work his canine as a canine handler, which

7  the Agency asserts is a full-time job.  In contrast, only weeks after she engaged in protective

8  activity, the Agency refused to allow African-American Agent Bishop to maintain her canine

9  certification and work her canine as a canine handler while performing promotional detail on the

10  purported ground that canine handling is a full time job so she cannot do both.

11      5.38    Until she made her May 3, 2016 complaint of race harassment and discrimination,

12  Agent Bishop likewise had been assigned to perform other jobs while serving as a Canine

13  Handler.  While being employed as a canine handler for ATF, the Agency repeatedly assigned

14  Agent Bishop to perform long-term duties that took considerable portions of her daily time at

15  work other than maintaining her canine, who she always found time to train daily.  For example,

16  while serving as a canine handler, Agent Bishop was also assigned to serve as the Public

17  Information Officer (PIO).  The PIO is responsible for handling all public and press inquiries,

18  publicizing the Seattle Office's work, and handling communications with Headquarters and other

19  ATF offices.  That role can take several hours to perform in a single day.

20      5.39    Likewise, while serving as a canine handler, Agent Bishop served as an acting

21  Group Supervisor—such as she did in Eugene, Oregon.  She was assigned this role on multiple

22  occasions for several months at a time.  This role, too, often takes many hours in the day—during

23  which she was not free to train her canine.

24      5.40    Similarly, Agent Bishop frequently has spent many hours each day working in her

25  core function as a special agent, as a criminal investigator.  During such times, she was not

26  working with or training her canine.

27

COMPLAINT - 12

5.41    At the time that Agent Bishop filed her May 3, 2016 discrimination, harassment, and retaliation complaint against GS Devlin, ███████ owed GS Devlin a personal favor. The favor arose because ███████ 's immediate family was being affected by drug-related criminal activity that ███████ wanted to stop, for personal reasons.  As a result, ███ ███ supplied information about the drug activity to GS Devlin.  Although drug trafficking is not within the mission of the ATF, as an ATF Supervisor Devlin obtained a warrant to investigate the activities of the drug dealer disrupting them to help ███████ personally.

5.42    Defendant failed to remedy and prevent the racial harassment that Agent Bishop was and is subjected to in her workplace.  And Defendant discriminated and retaliated against her for reporting that harassment, altering the terms and conditions of her promotional detail. Completing an assignment at ATF HQ is a requirement for promoting to grade GS15. Defendant's conduct illegally interfered with Agent Bishop fulfilling that requirement causing her harm.  And, Defendant's conduct illegally proximately caused her other financial harm and emotional distress.

## VI.    CLAIMS

6.1    By his acts described above, Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended and related regulatory provisions, through illegal harassment, discrimination, and retaliation causing harm and damages to Plaintiff.

## VII.    INJUNCTION ALLEGATIONS

7.1    Defendant has continued failure to take prompt and remedial measures to stop ATF employees from harassing, discriminating against, and retaliating against Plaintiff.  An injunction from this Court is necessary to enforce her rights under Title VII to be free of such mistreatment as an employee of the United States government.

## VIII.    REQUEST FOR RELIEF

WHEREFORE Plaintiff requests that the Court enter judgment and other relief against Defendants awarding Plaintiff:

COMPLAINT - 13

11256.01 le181104

1        8.1      Declaratory and injunctive relief;

2        8.2      Economic and general damages;

3        8.3      The tax consequences of any award;

4        8.4      Reasonable attorney fees and costs;

5        8.5      Pre-judgment and post-judgment interest;

6        8.6      The right to conform the pleadings to the evidence presented at trial; and

7        8.7      All other relief deemed just and fair.

8

9        DATED this 24th day of April, 2018.

10                                MacDONALD HOAGUE & BAYLESS

11

12               By: _____
                            Jesse Wing, WSBA #27751

13                             JesseW@MHB.com
                            Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT - 14

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

11256.01 kl241101

*Cheryl Bishop v. Jeff Sessions*

# EXHIBIT A




U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Seattle Field Division*

www.atf.gov

May 3rd, 2016

2130.3
CDB

MEMORANDUM TO:   Special Agent in Charge
                 Seattle Field Division

THROUGH:   Assistant Special Agent in Charge
           Seattle Field Division

FROM:   Cheryl D. Bishop
        Seattle Group IV

SUBJECT:   Complaint of Workplace Harassment and Character Defamation

As outlined in ATF O 2130.3, this is submitted to report my concerns regarding a pattern of workplace harassment, intimidation and personal character defamation by ATF Supervisor Brad Devlin.

## BACKGROUND

In 2009, I was assigned to Seattle Group V (Gang Group) in the Seattle Field Division. GS Devlin was the Supervisor of the group. At that time, I was the only minority person of color assigned and working in the group. During this time, GS Devlin sent emails to the Group V mailbox containing references that made fun of ethnic minority groups, predominately African Americans - to include President Barack Obama (see attached email examples). As the only ethnic minority in the group, I believe GS Devlin was attempting to harass and intimidate me and create a hostile work environment to induce me to leave the group. This is my belief because prior to being assigned to Group V - I was told by Supervisory Special Agent Doug Krogh (retired) that GS Devlin did not want me in Group V and did not particularly care for people of color. *NOTE\* I believe an investigative retrieval of emails during the referenced time period I was assigned to Seattle Group V, as well as time frames immediately preceding my transfer to the group and then following my transfer out, would reveal additional correspondence and communications by GS Devlin relevant to my claim of disparaging commentary toward ethnic minorities and intentional actions of harassment.*

On December 11th, 2009, and while assigned to Seattle Group V under GS Devlin, an incident occurred during which I perceived GS Devlin presented a physical threat of violence against me. I immediately verbally reported the incident to GS Devlin's Supervisor -- ASAC Robert Levingston (retired) and followed up with a written email (see attached email to ASAC Levingston dated 12/13/09). The following week ASAC Levingston verbally told me that he had spoken to GS Devlin about the incident. However, ASAC Levingston did not elaborate and gave no further details regarding his conversation with GS Devlin. Soon after this incident, SAC Kelvin Crenshaw (retired) requested I transfer out of Group V and assume duties as the PIO for the Seattle Division. Within a short time frame, GS Devlin received a previously requested and desired PCS to become a RAC in the Portland, Oregon field office. To my knowledge, the reported incidents of threatened physical violence, intimidation and harassment that occurred in 2009 were never reported or forwarded by ASAC Levingston to IAD or OPRSO.

In February, 2011 -- a retirement function and gathering was held for ASAC Levingston in Seattle. At this event I observed RAC Devlin roll up the sleeve of his shirt and display a large Nazi swastika tattooed on his shoulder. I was standing a few feet away as RAC Devlin displayed the tattoo to Supervisor Michael Graham (formerly RAC in Anchorage Alaska) and a white female (I recall as being either Jodi Doane or Christie Goldsmith) from the Portland Field Office. As RAC Devlin was displaying the tattoo he looked over at me, made eye contact, turned back to the others -- said something, laughed and then rolled down his sleeve.

The next day I spoke with former ASAC Charlie Smith and SAC Kelvin Crenshaw (retired) about RAC Devlin's display of the swastika tattoo. I told the ASAC and SAC that it was upsetting seeing a symbol of hate displayed like that by an ATF agent and that I found it not only offensive and disturbing but that it seemed highly inappropriate it was displayed in such a manner and place. ASAC Smith and SAC Crenshaw said they agreed and that ASAC Smith would speak with Devlin about it. ASAC Smith later told me that he had spoken with Devlin about the tattoo and that Devlin told him he got it for undercover work and that the undercover branch would not pay to have it removed. ASAC Smith further stated he (Smith) later contacted the undercover branch who advised the ASAC that their policy is that if a tattoo was obtained by an agent in furtherance of undercover work then they (undercover branch) would pay to have the tattoo removed. ASAC Smith said he advised RAC Devlin that the undercover branch would pay to have the tattoo removed. I have no knowledge if RAC Devlin still has the tattoo or if there were any further discussions about it.

## RECENT INCIDENT
On April 21st, 2016, I was told by RAC Colleen Domenech (Portland Field Office) that RAC Devlin (now of the Eugene Field Office) had heard I was interested and/or applying for the upcoming RAC vacancy in Eugene and that RAC Devlin had been telling people I was unqualified to be a supervisor and that in Devlin's opinion I would be a "train wreck" for the Eugene Office. RAC Domenech further told me that RAC Devlin had been making disparaging comments about me and my qualifications to people both inside and outside of the agency.

On this same date, I sent an email to RAC Devlin asking him about the allegation that he had been making disparaging comments. RAC Devlin responded in an email that he did not know what I was talking about and that he had been asked by an AUSA about me and had told the

AUSA I "lacked street experience". RAC Devlin further replied that I may not agree but that was his opinion and he did not care what I thought. I replied to RAC Devlin that he did not know anything about me and that I had been working complex street investigations and T-IIIs (including the first multi-defendant T-III RICO initiated in Washington State) well before he was hired by the agency (see attached emails).

In summation; this is respectfully summited to summarize what I believe has been a long standing pattern of workplace harassment and character defamation perpetrated against me by Supervisor Brad Devlin. I believe the workplace harassment and attacks by Supervisor Devlin have been detrimental and damaging to me both professionally and personally. By submitting this information I hope that an investigation will be conducted into the totality and historical pattern of Supervisor Devlin's behavior and actions in accordance with ATF O 2130.3 and applicable Bureau policies, standards of professional conduct, behavior and Federal laws.

Cheryl Bishop

*Cheryl Bishop v. Jeff Sessions*

# EXHIBIT B

### MEMORANDUM OF UNDERSTANDING
### Extended Temporary Duty Assignment
### Cheryl Bishop
### July 10, 2016 through July 8, 2017

This memorandum sets forth the agreement between Cheryl Bishop, herein referred to as the "Employee," and the Resource Management Staff (RMS) in the Office of Science and Technology, regarding the employee's extended temporary duty (TDY) assignment as NTE-1 year detail TDY as GS-1811-14/Program Manager.

**Definitions**

Gaining Supervisor – the supervisor to whom the Employee will report while on extended TDY.

Original Field Division Office – the office from which the Employee is currently assigned.

Receiving Office – the office to which the Employee will be working on an extended TDY assignment.

Temporary Duty Location – the city and State where the Employee will be working while on the extended TDY.

**Human Resource Information**

**Effective Date and Termination Date.** The effective date of the extended TDY assignment is July 10, 2016, for a period of 363 days (not to exceed 364 days). The termination date of the extended TDY assignment is July 8, 2017. The Employee continues to be assigned as Special Agent to the Seattle Group IV-Intelligence, Seattle Field Division. During this extended TDY assignment, the following terms and conditions shall apply:

**Location.** The Employee will work in the receiving office, Resource Management Staff, Office of Science and Technology at 99 New York Avenue, N.E., Washington, D.C., as a temporary duty station on an extended temporary assignment.

**Continued Employment.** The Employee shall continue to be employed by the Seattle Field Division with no break in Federal service. During the period of this extended TDY assignment, the Employee's time and attendance records will be keyed into the payroll system by the Employee and approved by the gaining supervisor. Any requests for leave by the Employee are subject to the approval of the gaining supervisor. At the conclusion of this extended TDY assignment, the Employee shall return full-time to his/her position as a G/S 14 Special Agent in the Seattle Group IV-Intelligence Office, Seattle Division.

**Salary.** The Seattle Field Division will continue to pay the Employee's salary and benefits for the duration of this extended TDY assignment. There will be no change in the locality pay rate as a result of the extended TDY assignment. Any awards recommended by the RMS/OST for the Employee's performance as Program Manager, RMS/OST, will be paid for by RMS/OST.

2

**Performance Appraisal.** For the duration of the extended TDY assignment, RMS/OST will prepare the Employee's performance appraisals. The RMS/OST will provide the Employee with a close out rating within 30 days of the completion of the extended TDY assignment.

**Personnel Records.** During this assignment, the Employee's drop file will remain with original office. The Seattle Group IV-Intelligence Office will be responsible for processing all personnel and payroll actions during the extended TDY assignment period.

**Training.** The RMS/OST is responsible for ensuring that regular training to maintain readiness/qualifications by the Employee is scheduled. The RMS/OST is responsible for paying for any additional training that may be necessary while the Employee is on the extended TDY assignment.

**Travel Related Information**

**Per Diem.** In accordance with U.S. Department of Justice and other Federal travel regulations, ATF has established the following per diem rates:

> **Lodging.** Lodging expenses will be reimbursed at actual costs incurred, not to exceed the maximum locality per diem rate in effect as prescribed by the General Services Administration for lodging. Lodging at a facility contracted with the government will be procured through the Financial Management Division. Lodging will be direct billed to the government so receipts for lodging are not required to be submitted.

> **Meals and Incidental Expenses.** Meals and Incidental Expenses (M&IE) will be 100 percent for the first 30 days, every day over the initial 30 days the M&IE will be reduced to 75 percent of the applicable M&IE rate as prescribed by the General Services Administration. No M&IE will be paid when the Employee is on personal or official travel to his home district for home visitation travel or when annual leave is taken. M&IE will be paid when the Employee is on sick leave and remains at the temporary duty station. When the Employee travels on official business for OST, M&IE will be paid by RMS at the standard M&IE rate of the city where the travel takes place, unless the city is his official duty station in his home district. Travel on official business for the Seattle Group IV-Intelligence will be paid by Seattle Field Division.

**Local Transportation.** Employee should request reimbursement through the Public Transportation Incentive Program (PTIP) to cover any local transportation costs. Reimbursement for any local transportation costs, up to $100, before the PTIP benefits are received, will be noted on the travel voucher and no receipts are required.

**Personal Long Distance Telephone Calls.** In accordance with ATF travel policy, reimbursable long distance calls must be made to the Employee's residence or to the location of the spouse, family member, or roommate, if that person is not at the Employee's home at the time the call is placed.

3

The employee should utilize their government-issued cell phone to make their personal long distance calls as outlined above. If this is not feasible, the Employee shall use a government-issued calling card to place personal calls, if the employee has one assigned. However, if a government-issued cell phone or calling card is not used, personal calls are limited to actual expenses not to exceed $5 per day and a phone bill/receipt must be provided monthly for reimbursement.

**Laundry.** Employees on an extended TDY assignment may be authorized laundry and/or dry cleaning not to exceed $25 per month for laundering of professional attire. Dry cleaning must be done at the TDY location, and receipts are required when claiming reimbursement of dry cleaning. Where laundry facilities are provided at no cost to the traveler, reimbursement is not necessary and therefore may not be authorized.

**ATM Fees.** Employees on an extended TDY assignment may be authorized reimbursement of ATM fees not to exceed $8 per month.

**Internet Charges.** When Internet connectivity is provided or included in the monthly long-term rental fees, or available from an ATF facility, reimbursement will not be authorized.

**Parking Fees.** Parking expenses will be reimbursed if they are authorized in advance of travel. Receipts are required for reimbursement of parking expenses regardless of the amount.

No other travel allowances are authorized for this extended TDY assignment except as discussed elsewhere in this MOU.

**Receipt Requirements.** Receipts for dry cleaning and other items are required in accordance with ATF Travel Order 1540.1.

**Residence.** The Employee must sign the certification at the bottom of the signature page indicating that he intends to maintain his/her personal abode in a real and substantial sense during the extended TDY assignment. The Employee understands that it is his/her responsibility to notify FMS-ISB if, at any point during the extended TDY assignment, the personal residence is no longer maintained, or has changed in a substantial manner to reduce living expenses, so that the monthly per diem reimbursement can be reassessed and reduced. The Employee should notify FMS-ISB before this occurs to establish the new reduced lodging rate and to ensure continued compliance with the Employee's residency obligation.

**Return Trips Home.** The Employee may be authorized by RMS/OST to return home based on a determination that the return trip is advantageous to the Government. Return trips will be limited to one per quarter and require approval by the Assistant Director of Science & Technology. Only round trip transportation costs will be reimbursed.

**Travel Voucher Submission.** All extended TDY travel vouchers will be forwarded to the Employee's approving official for review and signature in accordance with ATF Travel Order 1540.1 and subsequently forwarded to the Travel and Relocation Branch, Financial Management Division.

4

**Termination.** This agreement may be terminated by any party upon 30 days written notice to the other parties. If the RMS/OST terminates this agreement early, the RMS/OST will be responsible for all costs associated with early termination of the Employee's lease. If the Employee terminates this agreement, the Employee will be responsible for all costs associated with early termination of the lease.

**Taxability.** It is the general policy of ATF that extended TDY assignments are not extended beyond 364 days. If this extended TDY assignment exceeds 1 year, or at the point it is known that the extended TDY assignment will exceed 1 year, lodging and M&IE payments/reimbursement will become subject to Federal, State, and local withholding, including FICA and Medicare. It is incumbent upon the ATF to advise the Employee when withholdings may be subject to taxation. ATF will then advise ATF officials to withhold taxes subject to current regulations. The Employee understands that it is his/her responsibility to maintain an accurate record of days spent at the extended TDY assignment location to facilitate the calculation of the 364-day period. Please note that the Travel and Transportation Reform Act of 1998, Pub. L. No. 105-264 amends Chapter 57 of Title 5 of the U.S.C. to provide for reimbursement of Federal, State, and local income taxes incurred by employees for any travel or transportation reimbursement. All payments of travel expenses (lodging and M&IE) subject to income taxes are reimbursed. (These provisions only take effect when it is known that the extended TDY assignment will exceed a 1 year period.)

After 6 months, the Employee may incur income tax liability by the jurisdiction of residence at the extended TDY location. It is incumbent upon the Employee to check the specific State and local tax laws of the jurisdiction of residence at the temporary duty location. The jurisdiction of the Employee's permanent residence may allow credits for taxes paid to the jurisdiction of the extended TDY assignment.

**Other.** The written Travel Authorization – Extended Temporary Duty Assignment (ATF Form 1520.1B) will be issued by the receiving office upon receipt of the completed and signed Memorandum of Understanding.

Copies of the Travel Authorization and the completed and signed Memorandum of Understanding will be provided to the Employee; the original division office; the Directorate's receiving office; the Travel and Relocation Branch and Finance Branch, Financial Management Division, Office of Management.

**Notification.** No deviation from this Memorandum of Understanding shall be authorized without the express written approval of the parties signed hereto.

5

## APPROVALS

Employee

DATE: 6 / 2 / 16

Approving Official, Receiving Office

DATE: 6/2/16

Approving Official, Original Field Division Office

DATE: 6/2/16

Chief, Financial Officer

DATE:

## CERTIFICATION

I understand that I have an obligation to maintain my personal residence during the course of this extended TDY assignment. I hereby certify that I do intend to maintain my personal residence at my official duty station during this extended TDY assignment. If at some point during the extended TDY assignment, I plan to no longer maintain my personal residence at my official duty station or to change it in a substantial manner so as to reduce living expense, I will notify Resource Management Staff/OST before this occurs.

Employee

DATE: 6/2/16