The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHERYL BISHOP,<br><br>                Plaintiff,<br>     v.<br><br>WILLIAM BARR,<br><br>                Defendant. | Case No. C18-00599 TSZ<br><br>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Note on Motion Calendar:<br>August 30, 2019 |

Defendant William Barr, Attorney General of the United States, respectfully moves for summary judgment because plaintiff was not subjected to discrimination, harassment, or retaliation. Throughout the relevant time, plaintiff worked for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as a Special Agent Canine Handler ("SACH"). Like other canine handlers, she was assigned a canine partner and following extensive training for both plaintiff and the canine, the canine was certified to work at ATF by the agency's National Canine Division ("NCD"). All canine handlers are expected to maintain their canines at a high level of proficiency so that they are able to detect explosive devices. Gleysteen Dep. at p. 66:17-67:6 (explaining that the canines work "significant national security events," they need "to be at their best all the time," and if they "miss one bomb, people die"). To that end, canine handlers are expected to train their canines every day. Four to six hours a day is ideal, and handlers must train the dogs for at least two hours a day on weekends, holidays, and vacations.

In 2016, plaintiff sought a one-year detail to work at ATF's headquarters in Washington, D.C. The detail would be working a desk job in an office building and did not include canine handling duties. Nevertheless, plaintiff sought to keep her canine certified during that time. When NCD officials learned of her plan, the head of the program determined that she could not maintain the operational readiness of the canine by training it only a minimal amount of time for the year. Plaintiff was given the option to take the detail and retire the canine, even though she had not fulfilled her mandatory 5-year commitment to the canine program. Plaintiff claims that decision was discriminatory, even though no other employee was offered the option to take such a detail and keep his or her canine certified. She also claims that the agency discriminated against her by suggesting that if she took the detail, the division got a second canine, and the agency filled her position in the meantime, she might have to relocate to Portland. However, the possibility of a transfer was too remote to constitute an adverse action, plaintiff had signed a mobility agreement as a condition of her employment, and no other employee was treated differently.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Plaintiff also claims that another agent created a hostile work environment for her by disparaging her. However, the instances of disparagement she complains about were a year and a half apart, and none of the harassing conduct she alleges was race based, affected her performance, or was severe and pervasive. Rather, plaintiff complains about isolated instances spanning a lengthy period. Finally, plaintiff has no evidence to support her retaliation claim because the employee who decided that her canine could not maintain its certification did not even know that she had made a workplace complaint. Accordingly, defendant is entitled to summary judgment.

## I.     FACTS

Throughout the relevant time, plaintiff worked for ATF in the Seattle Field Division ("SFD"). Her second level supervisor was Assistant Special Agent in Charge ("ASAC") Celinez Nunez, and her third level supervisor was Special Agent in Charge ("SAC") Doug Dawson. Plaintiff was a SACH assigned to ATF's Crime Gun Intelligence Center. Nunez 2017 Dep. at p. 13:14-16. SACH is a full time position, not a collateral duty. Bishop 2017 Dep. at p. 71:13-23. In that role, plaintiff trained her assigned canine every day and responded to requests to deploy the canine to assist in finding guns or other ballistic evidence, in addition to special agent duties. *Id.* at p. 21:23-22:4, 29:12-30:22; Bishop 2017 Dep. at p. 21:14-22.

**A.     Plaintiff Received Numerous, Significant Accolades and Awards from the Same Supervisors She Now Accuses of Racism.**

As plaintiff's second level supervisor, Nunez was the reviewing official for plaintiff's annual performance appraisals in 2014, 2015, and 2016. For all three years, Nunez and plaintiff's first level supervisor gave plaintiff an overall performance rating of "Outstanding," which is the highest possible rating. Nunez Decl. at ¶ 4, 5, 6. Nunez and plaintiff's third level supervisor, Doug Dawson, also nominated plaintiff (as one of only three employees out of the 144-employee division) for a Quality Step Increase ("QSI") pay raise in late 2015. Nunez Decl. at ¶ 7. Plaintiff's QSI was granted and effective January 10, 2016. *Id.*

In 2016, the Deputy Director of ATF, Ronald Turk, asked Nunez and Dawson to choose two of their employees in the entire Seattle Field Division to receive a special recognition coin for

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 3

their outstanding work during his upcoming trip to Seattle. Nunez 2017 Dep. at p. 15:6-16:12. Nunez recommended plaintiff, *id.* at p. 16:8-12, and Dawson fully supported Nunez's recommendation. Dawson Dep. at p. 39:10-14. Turk addressed all of the employees in Seattle, gave plaintiff a coin, and encouraged plaintiff to pursue an assignment at ATF headquarters in Washington, D.C. Nunez Dep. at p. 16:13-23; Bishop 2017 Dep. at p. 79:16-23.

**B.    Plaintiff Sought a Detail to Headquarters in 2016.**

Under ATF's written Special Agent Career Plan, agents must work for at least a year in a headquarters designated position to be eligible to be promoted to an ASAC position. Bishop 2017 Dep. at 81:5-14; Nunez Decl., Ex. B. Nunez encouraged plaintiff to consider working for a time at ATF headquarters a temporary detail, also known as a TDY, in Washington, D.C. Nunez 2017 Dep. at p. 23:8-24:5. A detail or TDY is "when you are dispatched to a location other than your regular assigned post of duty" for a period from weeks to years. Bishop 2019 Dep. at p. 15:2-7.

Due to the agency's budget constraints, one-year TDYs were very difficult to find. Nunez Decl., Ex. A at p. 3; Bishop 2019 Dep. a p. 95:25-96:4. Nunez called numerous ATF HQ directorates to help find a one-year detail for plaintiff. Nunez Decl., Ex. A at p. 3. Dawson also actively sought TDY positions for plaintiff. Dawson Dep. at p. 60:16-20. Michael Gleysteen, the Assistant Director of Field Operations for ATF, also spoke to several people attempting to get a detail to headquarters for plaintiff. Gleysteen Dep. at p. 42:10-44:14.

The Office of Science and Technology ("OST") Directorate was seeking someone to help with a one-year working group to help develop ATF's next generation case management system. Amended Complaint (Dkt. #23) at ¶ 5.5. That detail did not include canine handling duties. Plaintiff's name was forwarded to OST Assistant Director Roger Beasley as a potential candidate. *Id.* Around the same time, Don Robinson, who was the SAC at the National Center for Explosives Training and Research ("NCETR"), offered a detail at NCETR working with the FBI. Bishop 2017 Dep. at p. 84:20-85:21. Robinson also proposed a TDY as a liaison officer with another group. Robinson Dep. at p. 114:13-115:14. Gleysteen and Robinson put time and effort into

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

finding a detail for plaintiff even though, at their level, they did not normally get involved in those matters. *Id.*; Gleysteen Dep. at p. 218:10-12. Plaintiff weighed the offers for details and decided to accept the offer from OST. Bishop 2017 Dep. at p. 86:16-25. Plaintiff admits, "Everyone was supportive" of her detail. *Id.* at p. 85:1-3, 106:3; Amended Complaint at ¶ 5.7 (Gleysteen wrote, "This TDY has our full support."); Dawson Dep. at p. 41:15-42:1, 154:1-8.

**C.    Three Different ATF Offices Were Coordinating on Aspects of Plaintiff's Detail**

Three different offices coordinated on various aspects of plaintiff's detail: the SFD, OST, and NCD, which reports to NCETR. Martinez Dep. at p. 27:6-10. The SFD wanted the canine to maintain its certification. Dawson Dep. at p. 42:12-43:24, 81:4-8 (explaining that his goal was to get plaintiff the detail and have the canine keep its certification so the SFD did not have to wait for a replacement canine). OST staff were amenable to plaintiff bringing the canine on the detail. However, they did not have complete information, and whether the canine could maintain its certification was not their decision. Martinez Dep. at p. 111:11-20, 112:16-18. Plaintiff never talked with Beasley about how much time she would need to train the canine. Bishop 2017 Dep. at p. 90:20-22. While she was being considered for the detail with OST, a staff member from OST emailed plaintiff on May 26, 2016, and explicitly asked, "Also, are there any training requirements for your canine duties?" Bishop 2019 Dep., Ex. 9. In responding, plaintiff did not set forth any information about daily training, or even state that daily training was required. *Id.*

The detail at OST was a full time job. Bishop 2019 Dep. at p. 15:8-11. Plaintiff trained her dog at least two hours every day while in Seattle; while on the detail, she planned to train the dog daily "at least the same amount." Bishop 2017 Dep. at p. 128:20-129:3. She never discussed training that amount of time with Beasley, who made the decision to offer her the detail, and he could not have afforded to lose what would be at least 25% of her time every day to training her canine, which would not have advanced the mission of OST. Beasley Decl. at ¶ 4, 5. In addition to that training time, plaintiff testified that she also planned to deploy her canine if the Washington Field Division ("WFD") needed her to do so, and she planned to train sometimes at Front Royal, Virginia, which was an hour and a half away (one way) from the headquarters building in

Washington D.C.  Bishop 2019 Dep. at p. 36:24-37:2; Bishop 2017 Dep. at p. 128:7-12.

OST, SFD, and plaintiff signed a Memorandum of Understanding ("MOU") to set forth the agreement among plaintiff, the SFD, and OST regarding the terms of the detail.  Bishop 2019 Dep., Ex. 1.[1]  The purpose of the MOU was "so the expectations are known on the front end." Gleysteen Dep. at p. 57:15-58:4.  No one from NCD or NCETR signed the MOU.  Bishop 2019 Dep., Ex. 1.  The MOU set forth that the detail would be for 363 days, plaintiff would work for OST in Washington, DC "as a temporary duty station on an extended temporary assignment," and that plaintiff would receive lucrative benefits while on the TDY, including lodging and per diem for meals.  *Id.*  The MOU contained no reference to the canine, or to the canine maintaining its certification.  Bishop Dep., Ex. 1.  The MOU stated, "No deviation from this Memorandum of Understanding shall be authorized without the express written approval of the parties signed hereto."  Bishop Dep., Ex. 1.

Regardless of whether the SFD and OST supported the canine keeping its certification, the canine program had to approve of the canine keeping its certification during the detail.  Dawson Dep. at p. 43:10-17.  NCD is a separate division of ATF from OST.  Robinson Dep., Ex. 1.  NCD oversees the canine program.  Bishop 2017 Dep. at p. 57:2-4.  While the field divisions are responsible for their employees, NCD is responsible for ensuring that ATF's canine assets are trained and used effectively; only NCD has the authority to decide whether a canine is certified to continue to work for ATF.  Gleysteen Dep. at p. 110:5-17; Robinson Dep. at p. 10:13-17.

**C.**     **Plaintiff's Canine Could Not Maintain Its Certification While Plaintiff Performed an Entirely Different Full Time Desk Job.**

When plaintiff attended the annual canine recertification in San Diego, she had one very brief conversation with NCD Branch Chief Raphael Martinez and NCD Chief John Ryan.  Bishop

---

[1] The MOU erroneously stated that the detail would be at the GS 14 level, but plaintiff was working as a GS 13 and would have retained that grade on the detail.  ATF's written Order on promotions explicitly states, "While on detail, employees retain the grade and pay levels of the permanent position from which they have been detailed."  Morehead Decl., Ex. P at p. PROD-00002163.  A detail of more than 120 days to a higher graded position must be made under competitive promotion procedures in accordance with that Order, and plaintiff did not compete for the detail.  *Id.* at p. PROD-0002146; Bishop 2017 Dep. at p. 101:10-14.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

2017 Dep. at p. 110:23-111:1. Plaintiff did not tell Martinez and Ryan about particulars of the detail, Martinez and Ryan did not know that it was a year-long detail, and they assumed it would be a few weeks like other canine handlers who have come east for conferences, classes, and training activities. Martinez Dep. at p. 11:7-21, 65:21-67:16.

In late May 2016, NCD learned that the detail would be full time, which raised significant concerns that plaintiff would "not be able to maintain her canine at operational readiness" or do any call-outs with the canine "because of her full-time commitment to her TDY." Martinez Dep. at p. 74:9-75:17. NCD program manager Rich Clabeaux reached out to plaintiff, who explained that the detail was full time and she planned to keep the canine in maintenance training for the year. *Id.* at p. 76:12-78:13. Handlers are allowed to do maintenance training for the canines solely on weekends, holidays, and vacations; on those days, canine handlers can spend less time, but still a minimum of two hours a day, for training, grooming, and feeding their ATF-assigned canines. Robinson Dep., Ex. 3 at p. 6 (canine handlers responsible for "Maintenance training on weekends and holidays"); *id.* at p. 7; Martinez Dep. at 35:8-19, 77:20-25. Maintenance training is not to be used on a daily basis. Martinez Dep. at p. 35:14-17.[2] On weekdays, the canines are required to undergo more extensive training. ATF maintains a written Order titled, Explosives and Accelerant Canine Detection and Operations Program that sets forth the requirements for the care and handling of the canines by SACHs. Robinson Dep., Ex. 3 at p. 1. That Order requires canine handlers to maintain their assigned canines "at a high proficiency level," including daily training and completing a daily log of training activities. *Id.* at p. 10. The canines only eat when they find an explosive odor, and they have to be fed (and consequently trained) every day. Plemons Dep. at p. 65:5-12. Daily training includes both odor recognition and operational exercises. Robinson Dep. Ex. 3 at p. 6. Odor recognition training involves open area searches or can lines, which is using specific odors placed in cans to make sure the dogs maintain their ability to smell odors

---

[2] Because they are required to work with the canines on those otherwise non-work days, canine handlers are paid two hours of overtime for the time they train and care for their canines on those days. Bishop 2017 Dep. at p. 58:25-59:19. Maintenance training exists because the agency did not want to pay for more than two hours of overtime for all canine handlers on non-work days. Robinson Dep. at p. 157:11-158:3.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

related to explosives. Plemons Dep. at p. 20:4-22. Operational training involves real world, scenario-type searches, including in vehicles and buildings. *Id.* at p. 20:23-21:14. Four to six hours of training activities per day is ideal because it takes approximately that amount of time to set up their training, let the odors sit for a time to permeate, run the canine through canine exercises, travel to training venues, groom the canine, clean their vehicles and kennels to keep the canine healthy, and exercise the dog enough to make sure they can search long distances when needed. Martinez Dep. at p. 21:1-22:12, 33:23-35:6. The requirement of four to six hours per day is not written in the policy because the canine might be working on search warrants all day, maintaining its skills that way instead of through training scenarios. *Id.* at p. 91:3-14.

In addition, canine handlers are required to participate in weekly and monthly training with Federal, State, and local canine teams. Robinson Dep., Ex. 3 at p. 6. In addition to the written Order, with which canine handlers are required to be familiar, NCD communicates to canine handlers about the training requirements in the canine academy and throughout their career. Bishop 2019 Dep. at p. 68:5-22; Martinez Dep. at p. 33:23-35:6. Consistent with those directives, other ATF canine handlers conducted extensive daily training with their canines. Hodnett Dep. at p. 41:21-44:9; Plemons Dep. at p. 34:15-35:10, 64:18-66:11; O'Sullivan Dep. at p. 13:9-15:14, 21:16-23:1, 24:19-25:6; Dvorak Dep. at p. 12:10-14:21, 26:14-25.

Don Robinson, the SAC of NCETR, was surprised to learn that plaintiff planned to take her canine on the detail for the year. Robinson Dep. at p. 180:18-181:8, 187:4-8. Before that time, he thought the only issue with the canine was whether plaintiff would be released from her five-year commitment to the canine program if she took the detail. *Id.* at p. 182:12-183:7. Because of the extensive training that the canines undergo,[3] ATF requires canine handlers to agree in writing

---

[3] Before they are certified, all ATF canines (and their handlers) are required to go through a full time, ten-week training course that involved "long days." Bishop 2017 Dep. at p. 48:8-49:16. Plaintiff graduated from the canine school with her assigned canine, Allegra, in July 2013. *Id.* at p. 17:11-13. After the basic canine handler course, all SACH are required to take a three-week course to be a Certified Explosive Specialist ("CES"). *Id.* at p. 46:16-47:1. Plaintiff also attended two in-service weeks of training at NCD in Front Royal, Virginia, and attended an annual recertification testing session every year with her canine. *Id.* p. 51:13-24. After canine handlers complete the canine academy, they are assigned to an individual field division; once there, their supervisor, their ASAC, and their SAC dictate their daily job duties. Plemons Dep. at p. 16:5-22.

to serve a minimum 5-year commitment with the ATF Canine Detection Program. Gleysteen Dep. at p. 49:16-20 ("It's a tremendous commitment of time, training, and finances to train both the K9 and the special agent canine handler"). In researching TDY opportunities, Gleysteen understood that plaintiff was a canine handler, so her 5-year commitment to the canine program was an issue.[4] It never occurred to him plaintiff was trying to do both full time jobs (canine handler and the OST detail) at the same time. Gleysteen Dep. at p. 49:7-50:21.

When Robinson learned that plaintiff wanted to do both jobs at the same time, he reached out to subject matter experts to better understand the training requirements for the canine. NCD branch chiefs Raphael Martinez and Deb Dassler, as well as Shawn Crawford (the lead canine trainer and subject matter expert), supplied information to Robinson including the written Order and information about the difference between operational readiness training and maintenance training. Martinez Dep. at p. 81:5-82:16, 83:21-23, 85:1-10. It was the consensus of the subject matter experts at NCD that plaintiff could not keep her canine at operational readiness and work the full time job at OST. *Id.* at p. 86:1-21, 90:22-91:2, 116:20-23, 134:6. Robinson and Gleysteen had significant safety concerns about plaintiff trying to keep the canine trained and certified while simultaneously performing a full-time desk job. Gleysteen Dep. at p. 66:17-67:6, 114:5-11 (explaining that ATF considers the SACH position to be full time; "we have a very proud and distinguished program and it's considered one of the best of the best in the world, and we didn't get there by being a bunch of part-timers."); *id.* at p. 123:1-11 ("I was not willing to compromise the integrity of our ATF explosives detection program."). In addition, Robinson was concerned that "it would be a bad example to set" to allow plaintiff to perform a second full time job because ATF expects the same level of training from its state and local law enforcement counterparts. Robinson Dep. at p. 162:13-163:16. Due to those concerns, Robinson made the decision that

---

[4] Gleysteen emailed Charlie Patterson, the Acting Deputy Assistant Director, who responded that plaintiff had two years left in her 5-year canine commitment. Amended Complaint at ¶ 5.5; Patterson Decl. at ¶ 3. Gleysteen emailed Beasley, "If you want to reach out to this employee feel free. We will work out the K-9 issue on the backend if you select her." *Id.* Gleysteen meant that they would release plaintiff from her five-year commitment to the program if she took the detail. Gleysteen Dep. at p. 49:7-50:21.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

plaintiff's canine could not keep its certification during the yearlong detail. Martinez Dep. at p. 118:15-17; Robinson Dep. at p. 205:9-20, 218:2-21. Plaintiff was offered the option of proceeding with the detail and retiring her canine or not taking the detail. Nunez Decl., Ex. A at p. 4. Though plaintiff still had two years of her commitment remaining, ATF offered to allow her to break that commitment and keep her canine as a pet if she went on the detail. Gleysteen Affidavit at p. 4.

Around the same time, Nunez sent a text to plaintiff explaining what might happen if the SFD was assigned a new canine while plaintiff was on detail:

> Hi Cheryl, I know you're still trying to make your decision on what do [sic] with your TDY. Just to give you heads up, according to Doug, if we get a second Dog it will be for Portland, which makes sense since we are starting CGIC there.
> If we get the a [sic] March class the only spot you will be looking at upon your return will be Portland.
> I want to give you everything that might play out in order for you to make an informed decision.

Nunez 2017 Dep., Ex. 68. Like all agents, plaintiff had signed a mobility agreement, agreeing in writing that the agency could relocate her at any time. Bishop 2017 Dep. at p. 142:9-17; Robinson Decl., Ex. 7 (written position description states, "May be called upon to move from one field office or field division to another depending upon the needs of the agency."). Nunez's intent was to communicate to plaintiff about the "possibility" that she could go to Portland if all of the following hypothetical possibilities actually occurred: plaintiff took the detail, the SFD was granted a second dog, they were able to get a spot in the March 2017 canine training class, they backfilled plaintiff's position, and plaintiff still wanted to work as a canine handler after the detail. Nunez 2017 Dep. at p. 35:6-36:8 (explaining that as a manager, Nunez wanted to give plaintiff "full disclosure"); *id.* at p. 155:1-157:19, 178:2-6; Ex. 68; Nunez 2019 Dep. at p. 62:4-63:2. Despite her good relationship with both Nunez and Dawson, plaintiff did not follow up with either of them about the issue. Bishop 2017 Dep. at p. 33:20-35:21, 136:18-137:15.

Ultimately, plaintiff declined the detail. Bishop 2019 Dep., Ex. 7. She sent an e-mail to Beasley explaining the reasons for her decision that the "added stipulations" led her to reevaluate "the potential best path forward in my continued efforts for career advancement;" "*I believe my*

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

*best chance for any measurable upward advancement with ATF is to again pursue a group supervisor position, complete the required two years – then seek potential available opportunities at HQ.*" *Id.* (emphasis added).  Plaintiff explained in her deposition that in writing the email, she was thinking about "what comes first, the chicken or the egg" and she had decided to obtain a supervisor position first and not risk relocating to Portland to "be under Devlin."  Bishop 2019 Dep. at p. 95:17-96:6.  Although plaintiff could apply for another detail or position at headquarters, she has not done so.  *Id.* at p. 49:17-22.

**D.  ATF Promoted Plaintiff Shortly After She Declined the Detail.**

After she declined the detail, plaintiff was promoted to be acting group supervisor of Seattle's Crime Gun Intelligence Center in May 2017.  Bishop 2017 Dep. at p. 13:8-14.  Once the supervisor position became open on a full time basis, plaintiff applied, was interviewed, and was selected in a competitive process over other candidates in September 2017.  *Id.* at p. 13:15-20; Bishop 2019 Dep. at p. 11:4-23.  When plaintiff accepted the full time supervisor position, she ceased working as a canine handler even though she still had over one year remaining on her 5-year canine commitment.  Bishop 2017 Dep. at p. 15:8-15; Bishop 2019 Dep. at p. 12:4-23. Nevertheless, AFT released her from that commitment so that she could accept the full time supervisor position.  *Id.*  Plaintiff has worked as a permanent supervisor ever since.

**E.  Management Sought a Promotion for Plaintiff that Led to a Conflict**

In 2016, the Resident Agent in Charge ("RAC") in the Eugene ATF office, Brad Devlin, applied for a lateral reassignment to ATF's Office of Professional Responsibility and Security Operations, which includes Internal Affairs.  Dawson Dep. at p. 85:3-25.  Because Devlin's departure would leave an opening for a RAC in that office, Nunez suggested that the agency promote plaintiff to serve as RAC in Eugene.  *Id.*; Bishop 2019 Dep. at p. 89:19-92:4 (Nunez was an "advocate" for plaintiff to apply to supervisory positions).

In April 2016, when an Assistant U.S. Attorney asked Devlin if plaintiff was a hard charger and knew how to work the street, Devlin responded that although plaintiff had many years as an ATF agent, she did not have much street experience and she was a train wreck.  Nunez 2017 Dep.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

at p. 200:6-17.  Devlin made those remarks because when he supervised plaintiff for a year in 2009, she did not have many cases of her own, and she would tell other, more experienced agents how to do their jobs, creating resentment.  Devlin Dep. at p. 40:14-41:5.

Plaintiff told Nunez about the disparaging remarks.  Nunez called Devlin and told him that his remarks were unprofessional, and she instructed him not to contact plaintiff.  Nunez 2017 Dep. at p. 84:1-6.  Nunez asked plaintiff to memorialize the incident in writing, which she did in a memorandum.  Bishop 2017 Dep. at p. 145:6-11.  Plaintiff also attached to her memorandum emails she received from Devlin dated in 2009 that she believed were harassing.  Nunez promptly informed her supervisor, Dawson, about plaintiff's complaint, and talked with an ATF in-house attorney about the matter.  Nunez 2017 Dep. at p. 59:1-15.  The ATF attorney then forwarded the complaint to Internal Affairs.  *Id.* at p. 60:12-24.  Involving ATF counsel and Internal Affairs was a "big deal."  Devlin Dep. at p. 66:23-67:5.

Internal Affairs determined that the complaint would be best handled as a Management Referral.  Nunez 2017 Dep. at p. 54:17-19.  Nunez conducted fact finding about the complaint and instructed Devlin to have no communication with plaintiff.  *Id.* at p. 49:24-50:4, 52:5-53:2.

Ultimately, Nunez decided to issue Devlin an email of caution because she believed her predecessors had addressed the issues from years earlier, and Devlin had a reputation as a good supervisor.  Nunez 2017 Dep. at p. 55:8-17, 68:15-69:8.  In addition, Nunez believed that Devlin's comments were about his perception of plaintiff's abilities, not about her race.  *Id.* at p. 69:19-70:10; 124:13-125:10, 185:10-20.  Because of plaintiff's complaint, Internal Affairs withdrew its job offer to Devlin.  *Id.* at p. 99:17-100:9.  Devlin has never been promoted above group supervisor, even though he has held that role for approximately 12 years and was "heavily recruited" to work at headquarters before plaintiff's complaint.  Devlin Dep. at p. 10:22-24; 11:4-15, 12:1-8.

## II.     ANALYSIS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party to present specific facts showing a genuine issue for trial. *See, e.g., Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *See Celotex*, 477 U.S. at 322-23. A mere scintilla of evidence in support of the nonmoving party's position is not sufficient. *See, e.g., Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party must introduce some "significant probative evidence tending to support the complaint." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) (citation and quotation omitted). "Conclusory allegations unsupported by factual data are not enough." *Id.* "In other words, 'summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor.'" *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (citation omitted). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 324.

**A.    Summary Judgment Is Warranted on Plaintiff's Discrimination Claim.**

As an initial matter, plaintiff has no direct evidence of discrimination, such as discriminatory remarks by any decision maker. Absent direct evidence, motions for summary judgment in cases alleging disparate treatment are analyzed under the burden-shifting framework established in *McDonnell Douglas*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. *Id.*

To make out a prima facie case of disparate treatment, plaintiff must show that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated employees not in her protected class were treated more favorably. *See, e.g.*, *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). If Plaintiff is able to make out a prima facie case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Plaintiff must then establish that the employer's reason is a pretext for discrimination. *Id.* Where, as here, plaintiff is relying on circumstantial evidence, she must produce "*specific, substantial evidence of pretext*." *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir. 1996) (emphasis added). "When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a *McDonnell Douglas* type presumption." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890-91 (9th Cir. 1994).

Plaintiff cannot defeat summary judgment as to her claim that ATF discriminated against her by not allowing her canine to maintain its certification while plaintiff performed a non-canine handling, full time office job at ATF headquarters. First, plaintiff accuses Gleysteen and Patterson of discrimination, but neither knew her race. Gleysteen Aff. at p. 2; Gleysteen Dep. at p. 14:16-19; Patterson Dec. at ¶ 4. Without that knowledge, they cannot have discriminated against her. *See, e.g. Robinson v. Adams*, 847 F.2d 1315, 1315 (9th Cir. 1987) (employer cannot racially discriminate if job applicant's race was unknown).

Second, plaintiff has not shown that the denial of the canine's continued certification was an adverse action. "An adverse employment action in the racial discrimination context, unlike in retaliation context, is limited to changes in the 'terms and conditions of employment,' such as changes in salary, bonus, and overtime pay; changes in hours worked; loss of promotion; and firing. *See Reynaga v. Sun Studs, Inc.*, 27 F. App'x 740, 742 (9th Cir. 2001). In this case, plaintiff could have taken the detail, with all of its attendant privileges, but she chose not to because her canine could not keep its certification. However, there is no evidence that the canine's certification was a term or condition of *plaintiff's* employment, nor was it a material change like a change in salary, promotion, firing, or the like. In fact, plaintiff conceded that if she had gone on the detail, she could have received a new canine when she returned, applied for the supervisor position she currently holds, and once she got that position, ATF would have released her from the 5-year

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

commitment with that new canine.  Bishop 2019 Dep. at p. 93:12-25, 99:1-5.[5]  Finally, as plaintiff

explained in her email declining the detail, her decision came down to a "chicken or the egg"

scenario where she decided she would rather work as a supervisor first, then do a detail rather than

the other way around.  Bishop 2019 Dep. at p. 95:17-25.  She could still do a detail or permanent

work assignment at headquarters.  Nor is an adverse action demonstrated by the fact that Nunez

raised the possibility that if plaintiff took the detail, if plaintiff wanted to return as a canine handler,

and if Seattle got a second dog, she might have to relocate to Portland.  Plaintiff signed a mobility

agreement agreeing to be transferred for the needs of the agency.  Moreover, if plaintiff had gone

to work in the Portland office, she would not have been under Devlin's supervision because Devlin

worked in the Eugene office.  Dawson Dep. at p. 163:10-16.[6]  Regardless, a hypothetical future

transfer is not an adverse action. *See, e.g., Hellman v. Weisberg*, 360 Fed. Appx. 776, 779 (9th Cir.

Dec. 23, 2009) (holding that plaintiff did not suffer an adverse action when she was informed that

the judge she worked for wanted to fire her and have her criminally prosecuted because she was

never fired or prosecuted, and "the mere threat of termination is not an adverse action"); *Bogner*

*v. R&B Sys.*, 2011 U.S. Dist. LEXIS 50985 (E.D. Wash. May 12, 2011) (no adverse action in

FLSA retaliation case where plaintiff was threatened with termination); *Yee v. Solis*, 2010 U.S.

Dist. LEXIS 39824, *15-16 (N.D. Cal. Apr. 22, 2010) (no adverse action in Title VII retaliation

claim where plaintiff was served with a notice of proposed suspension but never suspended).

Third, even if plaintiff could establish that she suffered an adverse action, she cannot

establish that similarly situated employees were treated more favorably.  "[T]o show that the

employees allegedly receiving more favorable treatment are similarly situated ... the individuals

---

[5] Although plaintiff attempts to cast returning to the canine school as a separate adverse action, she admits that all special agents are required to attend canine school with their new canine partner.  Bishop 2019 Dep. at p. 40:4-6. Therefore, attending the school is not an adverse action but a job requirement. *See, e.g., McAlindin v. County of San Diego*, 192 F.3d 1226, 1239 (9th Cir. 1999) (no discrimination where all received the same training).

[6] The Portland office did not report to the Eugene office. Nunez 2017 Dep. at p. 219:15-18. Regardless of whether plaintiff worked as a canine handler in Seattle or Portland, she could theoretically have worked with Devlin if the Eugene office needed the support of a canine handler because plaintiff was the only canine handler for the Seattle Field Division. Dawson Dep. at p. 163:17-164:2.  In addition, Nunez told plaintiff that it was unlikely that Devlin would remain in the Eugene office anyway, but if he did, then they would not send plaintiff to the Portland office. Nunez 2017 Dep. at p. 158:15-159:2.  The SFD never got a second canine.  Bishop 2019 Dep. at p. 39:2-4.

seeking relief must demonstrate, at the least, that they are similarly situated to those employees *in all material respects*." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (emphasis added). Plaintiff must show that other employees were "treated more favorably" "in the specific situations relevant to her claims." *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1016 (9th Cir. 2018). As for the possibility of a transfer to Portland, she readily admits that no other canine handler was ever promised that he or she would not have to relocate, so no one else was treated better in that regard. Bishop 2019 Dep. at p. 19:25-20:6, 26:17-20.

Nor was any other agent treated more favorably in terms of the detail. Plaintiff admits that no other canine handler was offered a yearlong detail to headquarters, so by definition, none was allowed to keep his or her canine certified during such a non-existent detail. Bishop 2019 Dep. at p. 19:25-20:2. In that regard alone, plaintiff, who was offered a lucrative, very hard to find detail, was treated much better than other agents were. Because no other employee was allowed to go on a detail for a year and keep his or her canine certified, plaintiff has not identified anyone who was similarly situated "in all material respects."

Plaintiff notes that other canine handlers were allowed to perform additional duties, but that does not show different treatment. The full time detail plaintiff sought was not the same as performing collateral duties like temporarily filling in for an absent supervisor or training new agents while *also* working as a canine handler. Rather, the detail would have entailed plaintiff relocating to a different duty station and working full time, not as a canine handler, but in an office job at headquarters on a computer system. Moreover, different decision makers were involved. Supervisors in other field offices assigned duties to other canine handlers, and Robinson, the decision maker about the certification, was unaware of those collateral duties. Robinson Dep. at p. 88:1-9, 170:17-171:16; *see also Caldwell v. Boeing Co.*, 2019 U.S. Dist. LEXIS 61886, *23 (W.D. Wash. Apr. 10, 2019) (holding that coworkers were not similarly situated "in all material respects" when the employer was unaware of their conduct).

Also, plaintiff, like the alleged comparators, was allowed to perform collateral duties while serving as a canine handler. In fact, she was allowed to serve as the PIO, acting supervisor on

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

numerous occasions, Division Operations Officer on several occasions, and she supported crimination investigations on various enforcement operations. Bishop 2019 Dep. at p. 26:21-27:24; Bishop 2017 Dep. at p. 66:11-24. Therefore, plaintiff was treated the same as handlers who were simultaneously allowed to perform other duties.

Turning to the specific agents plaintiff identifies as comparators, Agent Dvorak performed as an on-the-job trainer and occasionally as acting supervisor, but those duties are not separate full time jobs like the detail plaintiff sought. Rather, an ATF written Order, the Special Agent Career Plan, explicitly states that special agents should seek leadership opportunities like acting supervisor assignments or on-the-job trainer opportunities to grow their skills and mentor junior agents. Nunez Decl. at ¶ 13, Ex. B. Therefore, as that Plan demonstrates, such responsibilities are part of the special agent job, not an entirely separate full time job like the detail plaintiff sought. Similarly, Agents Plemons and Hodnett, who also served as acting supervisor for short time periods, were not performing other full time jobs. Martinez Dep. at p. 58:24-59:6 (explaining that acting supervisors do not perform many of the duties that full time supervisors perform; "A lot of the full-time supervisor duties are handled by the ASAC."); *id.* at p. 62:7-13. Canine handlers are more easily able to continue training their canines on their "home turf" where they are familiar with the training venues and other law enforcement training partners. *Id.* at p. 63:25-64:18. Regardless, plaintiff was also allowed to serve periods as acting supervisor, including in 2017, so she was treated the same. Bishop 2017 Dep. at p. 13:8-20. Plaintiff also alleges that another canine handler, Stephanie D'Andrea, was "offered the option" by her supervisors to serve as PIO while she was a canine handler, but plaintiff does not argue that D'Andrea actually worked in the PIO role. Bishop 2019 Dep. at p. 22:4-10, 23:22-24:3. Regardless, plaintiff was also allowed to serve as PIO and canine handler simultaneously, so she was treated the same. *Id.* at p. 26:21-27:5.

Plaintiff also points to Ray Neely as a comparator; Neely served as a project officer and a canine handler assigned to NCD. Martinez Dep. at p. 67:17-25. The canine center is geared towards training canines, so employees working there are easily able to train their canines. *Id.* at p. 71:3-15. Therefore, jobs at NCD are fundamentally different from those in an office at the

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

headquarters office building. *Id.* Neely was a project officer in the special canine handler program, and worked on anything to do with that program. *Id.* Neely was unable to complete the administrative parts of the project officer assignment, so when he retired, NCD hired a new project officer, Rich Clabeaux, and retired Clabeaux's canine. *Id.* at p. 68:14-70:4, 73:8-74:8 (Clabeaux worked for a few months in the NCD project officer position before the position was changed to program manager and his canine was retired). Therefore, Neely had a different position in a different location than plaintiff sought, it did not work out to perform both tasks, and his replacement was treated the same as plaintiff as his canine was retired as plaintiff's canine would have been if she took the TDY with OST. Without an adverse action or the identification of similarly situated employees who were treated better, plaintiff cannot establish a prima facie case.

The agency had legitimate, non-discriminatory reasons for its actions. As set forth above, for safety reasons, the agency has to maintain its explosive detection canines at a high level of proficiency. Once the canine division learned that plaintiff planned to keep her dog in maintenance training for an entire year, Robinson determined that plaintiff could not keep her canine at an operational level for that length of time, and he was concerned about setting a bad precedent with ATF's law enforcement partners who are expected to adhere to the same standards.

The agency also had legitimate, non-discriminatory reasons for informing plaintiff that if she took the detail, she *might* have to relocate to Portland after the detail *if* she sought to return to being a canine handler and *if* the SFD got a second canine in the interim. Nunez was simply trying to give plaintiff all the information, even though the possibility was remote. As set forth above, the Seattle office had the greatest need for a canine, it would be without a canine if plaintiff's canine retired, it could not support two canines in the same office if it got a second canine, the second greatest need was in Portland where they were trying to stand up a second Crime Gun Intelligence Center, and there was no guarantee that plaintiff would want to return to Seattle or to her canine handling duties after the detail as opposed to seeking to promote or something else, none of which plaintiff disputes. Accordingly, plaintiff fails to establish that either Dawson or

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Nunez were motivated by improper animus in considering the possibility that plaintiff might need to relocate to the Portland Field Office if she continued as a canine handler.

Plaintiff also has no evidence of pretext. Plaintiff's belief that she should have been allowed to perform both full times jobs simultaneously is not sufficient to support a claim of race discrimination or to show pretext. *See, e.g.*, *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (explaining that an employee's subjective personal judgments about his or her competence to not raise a genuine issue of material fact). Specifically, evidence that a defendant-employer's articulated reasons for an adverse action were "objectively false" or that the employer made a mistake does not constitute evidence of pretext. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). "Rather, courts 'only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.'" *Id.* (internal citation and quotation omitted); *Caldwell*, 2019 U.S. Dist. LEXIS 61886 at *31.

Furthermore, plaintiff cannot establish pretext because the employees she accuses of racism are entitled to the same actor inference. The Ninth Circuit has held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Coghlan v. Am. Seafoods Co. LLL*, 413 F.3d 1090, 1096 (9th Cir. 2005) (internal quotation and citation omitted). The Ninth Circuit in *Coghlan* explained that the strong inference is not limited to cases involving hiring and firing and applies in job assignment cases. *Id.* When the same actor inference applies, plaintiff's burden to demonstrate pretext is "especially steep." *Coghlan*, 413 F.3d at 1096. The same actor inference applies in this case because all of the employees whom plaintiff accuses of discriminating against her had recently treated her very favorably. Just before the alleged discrimination, Supervisors Nunez and Dawson nominated her for a QSI, nominated her for the coin from DD Turk, supported her for a detail, and sought detail opportunities for her. Dawson also gave her a great reference when OST contacted him. Dawson Dep. at p. 41:17-42:1. Nunez gave plaintiff "outstanding" performance reviews. Similarly, "everyone" was very supportive of plaintiff taking the detail and assisted in obtaining the detail at

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

OST. Patterson, Robinson, and Gleysteen all searched for detail opportunities for plaintiff, and Robinson offered plaintiff two other details, which she did not accept. Plaintiff also claims that Ryan and Martinez discriminated against her, but in the same breath, she claims that in April 2016, they were supportive of the detail and allegedly told her she could keep the canine certified. After those positive actions, she faces a steep burden of claiming they all then became rascists a month later. Plaintiff cannot demonstrate pretext or overcome the same actor inference. For all of those reasons, summary judgment is warranted on plaintiff's discrimination claim.

**B.      Summary Judgment Is Warranted on Plaintiff's Hostile Work Environment Claim.**

Plaintiff cannot establish elements of her race based hostile work environment claim. To prevail on a hostile workplace claim premised on race, a plaintiff must show: (1) that she was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 642 (9th Cir. 2003). To establish the third element, a plaintiff must show that her work environment was both subjectively and objectively hostile. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). "Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

In this case, the complained of conduct is not race based. Plaintiff does not claim that Devlin, the only person she accuses of harassing her, ever said anything to her or to anyone about her race. She claims that in 2009, Devlin emailed a cartoon[7] and a joke about President Obama to

---

[7] Only one of the emails or cartoons is arguably race based: one cartoon depicts an African American couple apparently at a prison and the caption reads, "Christmas at the Johnsons." Gleysteen Dep., Ex. 43 at p. 98 (only illegible copy received). However, that email appears to have been forwarded by someone else, not Devlin. *Id.*

their work group, but the "joke" she referenced also mocks House Speaker Pelosi. Both the cartoon and the "joke" about the former President seem to be about politics not race. Gleysteen Dep., Ex. 43 at p. 97, 100-104. She claims that in 2009, Devlin excluded her from three or four meetings, although she does not know what they were about, and may have left a banana[8] on the hood of her car, although she did not see who put the banana on her car. Bishop 2019 Dep. at p. 79:24-80:3, 83:7-84:1. Also in 2009, plaintiff alleges that while she and Devlin were arguing in his office, he walked towards her aggressively, though he sat down as soon as she confronted him while she remained standing. Bishop 2019 Dep. at p. 102:22-103:11, Ex. 8. Plaintiff claims that in February 2011, she saw Devlin show his tattoo to another person who had asked to see it and he smiled at plaintiff. Dkt. #23-1 at p. 93. She caught such a fleeting glimpse of it that she thought it was a swastika, when in fact it was an eagle with SS lightning bolts in the center. Devlin Dep. at 18:2-7. Devlin got the tattoo for his job as part of his job duties working undercover for ATF with a white supremacist group. Devlin Dep. at p. 14:7-15:23. Plaintiff also complains that Devlin disparaged her performance in 2016, but performance is not race based, nor is it a "code word" for race. In 2016, Devlin was not plaintiff's supervisor, and they worked together only once between 2009 and the present at a large crime scene where they did not interact with each other at all. Nunez 2017 Dep. at p. 90:17-91:9; 105:17-106:11; Nunez 2019 Dep. at p. 68:16-18. A year and a half later, in December 2017, Agent Scoll, who did not work in Seattle, told Devlin that he heard Devlin had been "expelled from Headquarters," asked what happened, and Devlin retold the events and explained that plaintiff had filed a complaint against him. Devlin Affidavit at p. 3. None of these actions is about race. Also, plaintiff readily admits that she heard Devlin disparaging other ATF employees' performance, including Caucasian employees, demonstrating that such

---

[8] Title VII precludes recovery for any discrete acts of discrimination and retaliation that occurred more than 45 days before she filed her EEO complaint. *Morgan*, 536 U.S. at 2015. Discrete acts include work assignments, such as the alleged assignment that Devlin told her to go on in 2009 before she received a bulletproof vest. *See, e.g., Davis v. Coca-Cola Bottling Co.*, 102 Fair Empl. Prac. Cas. (BNA) 865 (11th Cir. 2008) (work assignments are discrete acts). Nor can plaintiff rely on any other discrete act to bolster her claim of hostile work environment. *Porter v. California Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005) ("If the [untimely] flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts.");

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

comments were not race based. Bishop 2019 Dep. at p. 53:20-56:8, 66:11-67:8. Plaintiff's subjective feelings that Devlin's actions were about race is insufficient to carry her burden. *Caldwell*, 2019 U.S. Dist. LEXIS 61886, at *49; *Vasquez*, 349 F.3d at 642 ("[T]he working environment must both subjectively and objectively be perceived as abusive.").

Moreover, plaintiff must, but cannot, allege acts sufficiently linked to constitute "one unlawful employment practice." *See Morgan*, 536 U.S. at 118. The *Morgan* court set forth three factors to examine in determining whether acts are part of the same "continuing violation:" type of action, frequency, and whether the actions were perpetrated by same person. 536 U.S. at 120-21; *Manatt v. Bank of Am.*, 339 F.3d 792, 798-99 (9th Cir. 2003); *see also Caldwell*, 2019 U.S. Dist. LEXIS 61886 (granting motion for summary judgment on harassment claim where plaintiff claimed he experienced "a series of disparate and largely unrelated events spanning approximately 15 months."). In this case, although plaintiff alleges that one person was responsible for the harassment, she alleges a series of different actions that took place over the course of nine years, from 2009 to 2017 inclusive. She complains about inappropriate jokes and other actions when Devlin was her supervisor in 2009; plaintiff saw Devlin's tattoo in 2011. Then years passed with no contact whatsoever between the two. In April 2016, Devlin disparaged her performance, then a year and half later, told another employee why he was denied a headquarters job. These events do not form a pattern of harassment. Instead, this case is like *Caldwell*, alleging isolated issues over time, although the time period in this case is years more spread out than the acts found not actionable in *Caldwell*.

Furthermore, an intervening act broke the causal chain between anything that happened in 2009 and the years later disparaging comments. Specifically, both plaintiff and Devlin were transferred to different positions. Devlin was transferred to the Portland office, and plaintiff voluntarily transferred in 2009 to another position after the Special Agent in Charge, who plaintiff does not accuse of discrimination, asked her to be his Public Information Officer. Bishop 2019 Dep. at p. 92:8-93:11. Plaintiff did not file a complaint over that transfer. *Id.* After the transfer, Devlin no longer supervised plaintiff. Because of that intervening act, plaintiff cannot claim that

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 22

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the 2009 events support her later allegation of a hostile work environment in 2016 and 2017. *See, e.g., Caldwell*, 2019 U.S. Dist. LEXIS 61886 at *37 ("Courts have repeatedly held that a transfer to a new position or facility breaks the chain necessary to link the otherwise untimely acts to those that are timely.") (citing numerous cases).

Even if plaintiff could overcome all of those hurdles, she cannot establish the final element of her claim. The non-discrete acts she complains about were not "severe or pervasive" enough to "alter the conditions" of plaintiff's employment.[9] After 2009, plaintiff and Devlin worked in different offices in different states and had no contact with each other. Accordingly, plaintiff's workplace was not "permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of … employment and create an abusive working environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000); *Garcia v. City of Everett*, Case No. 14-30RAJ, 2015 U.S. Dist. LEXIS 51067, *11 (W.D. Wash. Apr. 16, 2015). Nor did any allegedly harassing actions alter the conditions of plaintiff's employment. *Manatt*, 339 F.3d at 799. The Supreme Court has held that the "sporadic use of abusive language [and] gender-related jokes" are insufficient to create a hostile work environment. *Faragher*, 524 U.S. at 788. Plaintiff herself has disparaged Devlin, Nunez, and other ATF employees, referring to Devlin as a "jerk" in an email to their shared second level supervisor Nunez, referring to other ATF employees as "pathetic" and lacking in integrity to someone outside the agency, and referring to Nunez in an email as "pond scum." Bishop 2019 Dep. at p. 53:7-19; Morehead Decl., Ex. A. Finally, Devlin's conduct did not affect plaintiff's ability to do her job. Bishop 2019 Dep. at p. 56:23-57:10. For these reasons, summary judgment is warranted on plaintiff's hostile work environment claim.

---

[9] *Manatt*, 339 F.3d at 795-803 (affirming dismissal of hostile work environment claim where the plaintiff alleged racially offensive statements, pantomimes, and gestures); *see Vasquez*, 349 F.3d at 643 (holding that "no reasonable jury could have found a hostile work environment" despite allegations of racial discrimination including "that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos"); *Caldwell*, 2019 U.S. Dist. LEXIS 61886 at * 49-50 (imitating an ape and other conduct not sufficient); *Mangaliman v. Washington State DOT*, No. CV11-1591 RSM, 2014 U.S. Dist. LEXIS 41473, 2014 WL 1255342, at *10 (W.D. Wash. Mar. 26, 2014) (finding no hostile work environment and granting dismissal where the employee was called "dumb Filipino," yelled at by supervisors, "scrutiniz[ed]," and "subject[ed] to extensive performance testing").

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 23

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    **C.**     **Summary Judgment Is Warranted on Plaintiff's Retaliation Claim.**

2        To establish a prima facie case of retaliation, plaintiff must show that: 1) she engaged in a

3 protected activity; 2) she suffered an adverse employment decision; and 3) there was a causal link

4 between the protected activity and the adverse employment decision. *See, e.g., Villiarimo*, 281

5 F.3d at 1064. Under the *McDonnell Douglas* burden shifting, if the plaintiff establishes a prima

6 facie case, the burden of production shifts to the employer to articulate some legitimate, non-

7 retaliatory reason for the challenged action. *See, e.g., Bergene v. Salt River Agr. Imp. & Power*

8 *Dist. Project*, 272 F.3d 1136, 1141 (9th Cir. 2001). If the employer does so, the plaintiff must

9 show that the articulated reason is pretextual. *Id.* (citations omitted).

10        Plaintiff cannot demonstrate a prima facie case of retaliation regarding the canine

11 certification because the employee who made that decision, Robinson, did not know plaintiff had

12 made any workplace complaint. Robinson Dep. at p. 107:6-20. Neither did any employee who

13 may even arguably have influenced his decision, including Gleysteen, Patterson, Ryan, and

14 Martinez. Patterson Decl. at ¶ 4; Gleysteen Dep. at p. 79:11-22; Ryan Aff. at p. 2; Martinez Aff.

15 at p. 2; *see, e.g.*, *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (citations omitted)

16 ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged

17 in the protected activity."). For that reason, plaintiff's retaliation claim based on the detail fails.[10]

18        The possibility that plaintiff might have to move to Portland is not adverse because as set

19 forth above, plaintiff would not have been more likely to work with Devlin if she were in the

20 Portland office. Regardless, that remote possibility was too hypothetical to constitute an adverse

21 action. *See, e.g., Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)

22 (holding that to support a retaliation claim, an action constitutes an adverse employment action

23 only if it is "materially adverse," meaning that it would "dissuade[] a reasonable worker from

24 making or supporting a charge of discrimination."). Rather, retaliation must produce "an injury or

25 ───────────────

26 [10] Even if plaintiff could clear that hurdle, she cannot escape the fact that she was offered the detail and the MOU was signed *after* she made her complaint, which undermines any retaliatory motive. Nunez 2017 Dep., Ex. 63 (plaintiff complained about Devlin on April 21, 2016); Bishop 2019 Dep., Ex. 1 (MOU signed on June 2, 2016). Nunez continued to advocate for the canine to keep its certification. Gleysteen Dep., Ex. 43 at p. 110.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 24

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

harm." *Id.* at 67. The possibility of a future action that never comes to fruition is not sufficient to demonstrate an adverse action as the cases cited above in the discrimination section demonstrate.

Nor can plaintiff show that her complaint was the but for cause of the advice that she might have to relocate. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). Plaintiff cannot demonstrate that if she had not submitted her May 3, 2016 memorandum, she would not have faced the possibility of relocation because relocation was always a possibility as demonstrated by the mobility agreement she signed and by her written position description. Nunez only learned in June 2016 that getting a second canine in Seattle was a possibility. Nunez 2017 Dep. at p. 156:13-157:19. Relocation might result because ATF had the greatest need for a canine in Seattle, which plaintiff cannot dispute, Nunez advised plaintiff of the possibility so she could make a fully informed decision, and the SFD never got a second canine.

Finally, plaintiff alleges that Devlin retaliated against her in December 2017 when Scoll asked Devlin why Devlin was "banned from Headquarters," and Devlin explained that plaintiff had filed a complaint against him. Devlin Dep. at p. 71:3-11. At the time, Devlin did not work with plaintiff and both held the same position as supervisor in their respective offices. Answering the question does not constitute an adverse action. There is no evidence that Devlin repeated the story to retaliate against plaintiff. The comment in 2017 was not made to plaintiff or to anyone in the Seattle office. Devlin Aff. at p. 3 (Agent Scoll worked in Portland). These facts, in addition to the year and a half between plaintiff's EEO complaint and the single retelling of what happened, dispels any possible inference of retaliation. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (explaining that when the plaintiff attempts to establish the causal connection indirectly, relying on temporal proximity between the events, the events must be "very close" in time). Therefore, plaintiff cannot establish a claim of retaliation.

For all of the foregoing reasons, defendant respectfully requests that the Court grant his motion for summary judgment.

DATED this 8th day of August, 2019.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 25

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Respectfully submitted,

BRIAN T. MORAN
United States Attorney

_s/ Priscilla T. Chan_
PRISCILLA T. CHAN, WSBA #28533

_s/ Sarah K. Morehead_
SARAH K. MOREHEAD, WSBA #29680
Assistant United States Attorneys
Western District of Washington
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-7970
Email: Priscilla.Chan@usdoj.gov
Email: Sarah.Morehead@usdoj.gov

Attorneys for Defendant

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Case No. C18-00599 TSZ] - 26

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the Office of the United States Attorney for the Western District of Washington and a person of such age and discretion as to be competent to serve papers;

I further certified that on this date, I electronically filed the foregoing, the referenced declarations and exhibits, and the Proposed Order, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant(s):

Jesse Wing                    JessW@MHB.com

Dated this 8th day of August, 2019.

       *s/ Julene Delo*
       JULENE DELO, Legal Assistant
       United States Attorney's Office
       700 Stewart Street, Suite 5220
       Seattle, Washington 98101-1271
       Phone: (206) 553-7970
       Fax:   (206) 553-4067
       E-mail:  julene.delo@usdoj.gov