# Exhibit G

**Ex. G to Declaration of
Sarah Morehead
C18-00599-TSZ - 183**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CHERYL BISHOP,

        Plaintiff,

  vs.

JEFF SESSIONS, ACTING ATTORNEY    Case No. C18-00599-TSZ
GENERAL, DEPARTMENT OF JUSTICE,
ALCOHOL, TOBACCO, FIREARMS &
EXPLOSIVES,

        Defendant.
_____

VIDEOTAPED DEPOSITION OF BRADFORD DEVLIN

July 8, 2019

9:51 a.m.

1000 SW Third Avenue, Suite 600

Portland, Oregon

REPORTED BY:

Melinda Hermansen

CSR No. 10-0420, RPR

Ex. G to Declaration of
Sarah Morehead
C18-00599-TSZ - 184

U.S. LEGAL SUPPORT | www.uslegalsupport.com

```
 1    APPEARANCES:

 2

 3        For Plaintiff:

 4            MACDONALD HOAGUE & BAYLESS
              MR. JESSE A. WING
 5            705 2nd Avenue, Suite 1500
              Seattle, WA 98104-1745
 6            (206) 622-1604
              Jessew@mhb.com
 7

 8        For Defendant:

 9            UNITED STATES ATTORNEY'S OFFICE
              MS. PRISCILLA CHAN
10            MS. LILY MONFORT (Via telephone)
              700 Stewart Street, Suite 5220
11            Seattle, WA 98101-4438
              (206) 553-7970
12            Priscilla.chan@usdoj.gov

13
          Also Present:
14
              MR. ZACH HOOVER, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

```
 1   affidavits that you signed regarding your own EEO

 2   complaint and Cheryl Bishop's EEO complaints, have you

 3   signed any other affidavits or declarations in EEO

 4   matters?

 5         A.   No.

 6         Q.   Do you feel like you understand my question?

 7         A.   Yes, I believe I do.  I haven't -- I haven't

 8   signed any other declarations other than -- than the

 9   complaints, my only EEO complaint or the one involving

10   Cheryl Bishop.

11         Q.   Okay.  Would you briefly provide a summary of

12   your career at the ATF; you know, when you started, what

13   roles you played, what the locations were.

14         A.   Yes.

15         Q.   Thank you.

16         A.   I was hired as an ATF agent in June of 1999.

17   My first -- my first place -- my first work station was

18   El Paso, Texas.  I spent four years -- three or four

19   years there.  I went from El Paso to Tacoma, Washington

20   as an agent.  I worked Seattle and Tacoma, Washington

21   area.  I was an agent for about nine years.

22              I was promoted to the resident -- or, I'm

23   sorry, the group supervisor job in -- I believe it was

24   2007, late 2007.  That was the gang group in Seattle,

25   Washington.  Then I spent three, four years in a Seattle
```

1   gang group.  Then I accepted a position as the Resident

2   Agent in Charge of the Portland, Oregon field office.

3   And I -- I was in Portland as the Resident Agent in

4   Charge until 2015.  And then I opened the office in

5   Eugene, Oregon as the Resident Agent in Charge.  And

6   I've been in Eugene since.  I currently hold that

7   position and reside in Eugene.

8           Q.   Approximately when -- thank you.  When in 2015

9   did you open the Eugene office?

10          A.   Summertime.  I would say probably -- probably

11  July or August.

12          Q.   Okay.  Was that -- did you volunteer to open

13  the Eugene office?

14          A.   I had a couple of options.  I was being heavily

15  recruited to go to Washington, D.C.  I wasn't interested

16  in going to Washington, D.C.  At the same time, for

17  several years while I was in Portland, I had requested

18  an office be -- be initiated in Eugene, Oregon to cover

19  Central and Southern Oregon, and it took several years

20  for ATF to -- to give that -- to give the blessing for

21  that.  So they -- so I was -- I was offered the option

22  of going to Eugene and opening a new office, and I

23  accepted that over going to Washington, D.C.

24          Q.   Okay.  Were you being pushed to do one or the

25  other?

```
 1      A.   I was being highly encouraged, I wouldn't say
 2   pushed, to go to Washington, D.C.
 3      Q.   For what reason?
 4      A.   Because I had been a low level supervisor for
 5   quite a -- quite a few years.  And ATF's -- ATF's or
 6   management's belief was if you've been a supervisor for
 7   more than five years, you should -- you should promote
 8   up.  And the next step would be to go to
 9   Washington, D.C.
10      Q.   Okay.  So it was the Seattle office management
11   that was pushing you to go to D.C.?
12      A.   Yes.
13      Q.   Okay.  Or opening Eugene?
14      A.   That's correct.
15      Q.   Okay.  But you saw either one as an effort by
16   your management to promote you; is that right?
17      A.   The Eugene position was not a promotion.
18      Q.   Okay.
19      A.   It was just a lateral.
20      Q.   Okay.  Okay.  So when did you do the academy?
21      A.   The ATF Academy was June of 1999.
22      Q.   And was Doug Dawson one of the instructors that
23   you had in the academy?
24      A.   He was a -- I wouldn't call it an instructor.
25   He was a supervisor of the academy class, a visiting
```

```
 1    and I was in that program for about three or four years.
 2        Q.   Was it at the end of that that you became the
 3    supervisor in Seattle?
 4        A.   I first became a supervisor in Seattle in 2007.
 5        Q.   So was that right after?
 6        A.   It was -- yes, yes.
 7        Q.   Okay.  And you performed more than one
 8    undercover operation?
 9        A.   Yes.
10        Q.   How many would you say you did?
11        A.   Probably hundreds.
12        Q.   Okay.  And I understand one of them is called
13    the Order of Blood; is that right?
14        A.   Yes.
15        Q.   Okay.  Tell me a little bit about the Order of
16    Blood.
17        A.   Order of Blood is an Aryan-Nation-sponsored
18    outlet motorcycle club.  It was based in Ohio.  And
19    there were three full-time ATF undercover agents that
20    were able to -- to get in.  I was one of the three.  I
21    was able to get membership in it.
22             It was a -- it was a lengthy criminal case.  I
23    was undercover on that case for probably eight months.
24    It was -- it was very successful at the end.  We had --
25    we had a lot of arrests.
```

```
 1        Q.   Congratulations.
 2        A.   Thank you.
 3        Q.   I don't want to know a whole lot of the
 4   specific details, but some general details would be
 5   helpful.
 6             Did you go out of state to do this undercover
 7   work?
 8        A.   Yes.  It was in Ohio.
 9        Q.   You did go to Ohio?
10        A.   Yes.
11        Q.   Okay.  And did you essentially live with these
12   bikers?
13        A.   Yes.
14        Q.   So this was kind of a 24/7 lifestyle that you
15   had to adopt?
16        A.   Yes.
17        Q.   Okay.  And you mentioned that they were Aryan.
18   Is that another phrase -- another word for a white
19   supremacist?
20        A.   The Aryan is a group.
21        Q.   Okay.
22        A.   They call themselves Aryans, but yes, they are
23   white supremacists.
24        Q.   And during the course of your undercover
25   operations, did you have to participate in activities
```

```
 1  tattoo, the club tattoo.
 2       Q.  Okay.  And what is the tattoo?
 3       A.  It's a German eagle with SS bolts in the
 4  center.
 5       Q.  What is an SS bolt?
 6       A.  It's part of Hitler's secret police.  It
 7  signifies support for Hitler.
 8       Q.  Okay.  Was there Hitler talk among the group?
 9       A.  Yes.
10       Q.  Okay.  Support for Hitler, in other words?
11       A.  Yes.
12       Q.  Okay.
13       A.  Yes.
14       Q.  And you still have that tattoo; is that
15  correct?
16       A.  Yes.
17       Q.  I'd like to see it, please.
18       A.  Okay.  I got to take off my --
19       Q.  Yeah.
20       A.  -- shirt.
21           MS. CHAN:  And, Counsel, for the record, it's
22  just subject to the objections that we sent you.
23           Go ahead.
24  BY MR. WING:
25       Q.  Let me just ask you first.  Do you have any
```

```
 1        Q.  Okay.  You've described that you thought she

 2   had little street experience, and that some people

 3   thought she was bossy, and that she wasn't aggressive on

 4   getting criminal cases.

 5             Does that all amount to a train wreck or is

 6   there more?

 7        A.  Well, in my mind, there's more.

 8        Q.  Please explain.

 9        A.  I think that reputation is very important in

10   law enforcement.  And I -- I knew that before she came

11   to my group, her -- her reputation was poor.  And then

12   when she -- when she arrived in my group, she

13   worked -- I was her supervisor for -- I'm guessing about

14   a year, maybe a little bit more.  She didn't have many,

15   if any, cases on her own.

16             I remember one significant case, the only one

17   that she worked was one that another agent worked prior

18   to her, and I had transferred it to her.  But I do

19   remember Cheryl completing that case and -- and doing

20   fairly well when she got that case.

21             The other point that stands out in my mind

22   is -- is the other agents in the group had -- had a

23   difficult time getting along with her, or maybe she had

24   a difficult time getting along with them.

25        Q.  In what way?
```

1    A.  She was bossy.  She would try to tell them how
2    to do their job, many of which had many, many years of
3    experience and were very, very competent.
4        Q.  Did they complain to you?
5        A.  A couple of them did, yes.
6        Q.  Did you go to Cheryl and say, "Knock it off.
7    Your colleagues think you're bossy"?
8        A.  No, no.
9        Q.  Did you give her any feedback?
10       A.  I remember giving her feedback about a report
11   she wrote one time.  I tried to give her opportunities
12   to work so that I could see what she could do.  And I do
13   remember giving her positive feedback one time about a
14   report that she had written.
15       Q.  Okay.  Did you ever go to your ASACH and say,
16   "Cheryl's a train wreck.  What do I do with her?"
17       A.  No.
18       Q.  Why not?
19       A.  I felt I could work with her.
20       Q.  Did there come a time when you quite literally
21   got in her face when she was in your office?
22       A.  No, I didn't get in her face.  She -- that was
23   a time where there was -- I don't even remember what the
24   dispute was.  But I had sent an e-mail out about
25   gossiping, about talking negatively about other people,

```
 1        A.   Yes.
 2        Q.   And what did they tell you?
 3        A.   They said they couldn't.
 4        Q.   Did that surprise you?
 5        A.   Yes.
 6        Q.   Why did it surprise you?
 7        A.   It didn't make any sense to me.  I thought that
 8   they should have probably called me and at least learned
 9   of the situation about what happened before they
10   forwarded it.
11        Q.   Okay.
12        A.   I thought there -- I thought there should have
13   been a little bit of inquiry -- inquiry on their part
14   first.
15        Q.   Did you tell them what happened?
16        A.   Yes.
17        Q.   Did you tell them that you had -- in that
18   conversation, did you tell them that you had called
19   Cheryl Bishop a train wreck to U.S. Attorneys?
20        A.   Yes.
21        Q.   Did you -- what was their reaction to that?
22        A.   I don't think they had much of a reaction.
23        Q.   Did you get the impression they thought it was
24   no big deal?
25        A.   No, I didn't get that impression at all.
```

```
 1        Q.   What kind of impression did you get?
 2        A.   I got the impression that it was a big deal
 3   because they had -- they had talked with ATF counsel and
 4   it ultimately got referred to Internal Affairs.  So that
 5   was my sign it was a big deal.
 6        Q.   Have you come to recognize that it was not
 7   something you should have done or do you sort of shrug
 8   it off like, Okay, it's just a difference of opinion?
 9             MS. CHAN:  Object to the form.  Answer if you
10   know.
11             THE WITNESS:  I don't shrug it off.
12             What was your question?
13   BY MR. WING:
14        Q.   Do you think it was fine?
15        A.   Do I think it was fine as to what I --
16             MS. CHAN:  Object -- go ahead.  Object to the
17   form.
18   BY MR. WING:
19        Q.   Do you think it was fine for you to tell AUSAs
20   that Cheryl Bishop was a train wreck?
21             MS. CHAN:  Object to the form.  Answer if you
22   know.
23             THE WITNESS:  Yes, I do.
24   BY MR. WING:
25        Q.   Have you ever told anyone that you thought
```

1           MS. CHAN:  Object to the form of the question.
2    Answer if you know.
3           THE WITNESS:  He had asked me -- Ben Scoll
4    asked me during a RAC conversation in Seattle, he had
5    asked me -- he said, "Hey, I heard about this.  What
6    happened?"
7           And I told him, "Well, it's a long story."
8           And he said, "Well, I got time."  So I did give
9    him a brief synopsis at to what had happened, maybe a
10   two-minute synopsis, one-minute synopsis.  So I did tell
11   him, yes.
12   BY MR. WING:
13      Q.  Including telling him that you had disparaged
14   Cheryl Bishop to the AUSAs?
15      A.  I had told him what I referred to, yes.
16      Q.  Did you not recognize that in passing along
17   your opinion as part of telling this story, you were
18   continuing to disparage her?
19          MS. CHAN:  Object to the form, argumentative.
20   Answer if you know.
21          THE WITNESS:  No.
22   BY MR. WING:
23      Q.  You thought it was fine?
24      A.  Sure.
25      Q.  Have you told anybody else?

1      REPORTERS CERTIFICATE

2

3           I, Melinda Hermansen, CSR No. 10-0420,

4      Certified Shorthand Reporter, do hereby certify:

5           That the foregoing proceedings were taken

6      before me at the time and place therein set forth, at

7      which time the witness was put forth under oath by me;

8           That the testimony of the witness, the

9      questions propounded, and all objections and statements

10     made at the time of the examination were recorded

11     stenographically by me and were thereafter transcribed;

12          That a review of the transcript by the deponent

13     was not requested;

14          I further certify that I am not a relative or

15     employee of any attorney of the parties, nor financially

16     interested in the action.

17          I declare under penalty of perjury under the

18     laws of Oregon that the foregoing is true and correct.

19          Dated this day 20th day of July, 2019.

20

21

22     *Melinda Hermansen*
23     _____
       Melinda Hermansen
24     CSR No. 10-0420, RPR

25

Ex. G to Declaration of
Sarah Morehead
C18-00599-TSZ - 197    U.S. LEGAL SUPPORT | www.uslegalsupport.com    95

Bradford Devlin
July 08, 2019

```
 1                     BRADFORD DEVLIN

 2          I have read the transcript of my deposition
     taken on July 8, 2019, at Portland, Oregon, and make the
 3     following additions or corrections:

 4     PAGE   LINE   CORRECTION AND REASON FOR CORRECTION

 5   P 14, L 6: change "outlet" to outlaw

     P 16, L 18: change "clothing" to club
 6
     P 19, L 4: change "shouldn't to should
 7
     P 30, L 6: change "ASACH" to ASAC
 8
     P 33, L 6: change "68 agents" to 6-8 agents

     P 83, L 7: change "2140" to 21 Authority
 9

10

11

12

13

14

15

16                         [signature: B. Devlin]

17                       BRADFORD DEVLIN

18
       Subscribed and sworn to me before this 30th
19        day of July, 2019.

20                      _____
                        Notary Public for the State
21              of _____
         residing at _____
22                      My Commission Expires:_____

23
       Re:   Bishop vs. Sessions
24             United States District Court, Western District
          of
25             Washington, No. C18-00599-TSZ
               LH
```

Ex. G to Declaration of
Sarah Morehead
C18-00599-TSZ - 198