# EXHIBIT 12





**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

*Seattle Field Division*

www.atf.gov

May 3rd, 2016

2130.3
CDB

MEMORANDUM TO: Special Agent in Charge
Seattle Field Division

THROUGH: Assistant Special Agent in Charge
Seattle Field Division

FROM: Cheryl D. Bishop
Seattle Group IV

SUBJECT: Complaint of Workplace Harassment and Character Defamation

As outlined in ATF O 2130.3, this is submitted to report my concerns regarding a pattern of workplace harassment, intimidation and personal character defamation by ATF Supervisor Brad Devlin.

**BACKGROUND**

In 2009, I was assigned to Seattle Group V (Gang Group) in the Seattle Field Division. GS Devlin was the Supervisor of the group. At that time, I was the only minority person of color assigned and working in the group. During this time, GS Devlin sent emails to the Group V mailbox containing references that made fun of ethnic minority groups, predominately African Americans - to include President Barack Obama (**see attached email examples**). As the only ethnic minority in the group, I believe GS Devlin was attempting to harass and intimidate me and create a hostile work environment to induce me to leave the group. This is my belief because prior to being assigned to Group V - I was told by Supervisory Special Agent Doug Krogh (retired) that GS Devlin did not want me in Group V and did not particularly care for people of color. ***NOTE* I believe an investigative retrieval of emails during the referenced time period I was assigned to Seattle Group V, as well as time frames immediately preceding my transfer to the group and then following my transfer out, would reveal additional correspondence and communications by GS Devlin relevant to my claim of disparaging commentary toward ethnic minorities and intentional actions of harassment.***



On December 11th, 2009, and while assigned to Seattle Group V under GS Devlin, an incident occurred during which I perceived GS Devlin presented a physical threat of violence against me. I immediately verbally reported the incident to GS Devlin's Supervisor – ASAC Robert Levingston (retired) and followed up with a written email **(see attached email to ASAC Levingston dated 12/13/09).** The following week ASAC Levingston verbally told me that he had spoken to GS Devlin about the incident. However, ASAC Levingston did not elaborate and gave no further details regarding his conversation with GS Devlin. Soon after this incident, SAC Kelvin Crenshaw (retired) requested I transfer out of Group V and assume duties as the PIO for the Seattle Division. Within a short time frame, GS Devlin received a previously requested and desired PCS to become a RAC in the Portland, Oregon field office. To my knowledge, the reported incidents of threatened physical violence, intimidation and harassment that occurred in 2009 were never reported or forwarded by ASAC Levingston to IAD or OPRSO.

In February, 2011 – a retirement function and gathering was held for ASAC Levingston in Seattle. At this event I observed RAC Devlin roll up the sleeve of his shirt and display a large Nazi swastika tattooed on his shoulder. I was standing a few feet away as RAC Devlin displayed the tattoo to Supervisor Michael Graham (formerly RAC in Anchorage Alaska) and a white female (I recall as being either Jodi Doane or Christie Goldsmith) from the Portland Field Office. As RAC Devlin was displaying the tattoo he looked over at me, made eye contact, turned back to the others – said something, laughed and then rolled down his sleeve.

The next day I spoke with former ASAC Charlie Smith and SAC Kelvin Crenshaw (retired) about RAC Devlin's display of the swastika tattoo. I told the ASAC and SAC that it was upsetting seeing a symbol of hate displayed like that by an ATF agent and that I found it not only offensive and disturbing but that it seemed highly inappropriate it was displayed in such a manner and place. ASAC Smith and SAC Crenshaw said they agreed and that ASAC Smith would speak with Devlin about it. ASAC Smith later told me that he had spoken with Devlin about the tattoo and that Devlin told him he got it for undercover work and that the undercover branch would not pay to have it removed. ASAC Smith further stated he (Smith) later contacted the undercover branch who advised the ASAC that their policy is that if a tattoo was obtained by an agent in furtherance of undercover work then they (undercover branch) would pay to have the tattoo removed. ASAC Smith said he advised RAC Devlin that the undercover branch would pay to have the tattoo removed. I have no knowledge if RAC Devlin still has the tattoo or if there were any further discussions about it.

**RECENT INCIDENT**

On April 21st, 2016, I was told by RAC Colleen Domenech (Portland Field Office) that RAC Devlin (now of the Eugene Field Office) had heard I was interested and/or applying for the upcoming RAC vacancy in Eugene and that RAC Devlin had been telling people I was unqualified to be a supervisor and that in Devlin's opinion I would be a "train wreck" for the Eugene Office. RAC Domenech further told me that RAC Devlin had been making disparaging comments about me and my qualifications to people both inside and outside of the agency.

On this same date, I sent an email to RAC Devlin asking him about the allegation that he had been making disparaging comments. RAC Devlin responded in an email that he did not know what I was talking about and that he had been asked by an AUSA about me and had told the

AUSA I "lacked street experience". RAC Devlin further replied that I may not agree but that was his opinion and he did not care what I thought. I replied to RAC Devlin that he did not know anything about me and that I had been working complex street investigations and T-IIIs (including the first multi-defendant T-III RICO initiated in Washington State) well before he was hired by the agency **(see attached emails).**

In summation; this is respectfully summited to summarize what I believe has been a long standing pattern of workplace harassment and character defamation perpetrated against me by Supervisor Brad Devlin. I believe the workplace harassment and attacks by Supervisor Devlin have been detrimental and damaging to me both professionally and personally. By submitting this information I hope that an investigation will be conducted into the totality and historical pattern of Supervisor Devlin's behavior and actions in accordance with ATF O 2130.3 and applicable Bureau policies, standards of professional conduct, behavior and Federal laws.

Cheryl Bishop

**Bishop, Cheryl D.**

| | |
|---|---|
| **From:** | Devlin, Bradford L. |
| **Sent:** | Thursday, November 05, 2009 11:43 AM |
| **To:** | Seattle V |
| **Subject:** | FW: |
| **Attachments:** | imagejpeg950.jpg |

Funny...


OBAMACARE
Rx
EXHIBIT F
MYPLAN
THAT'S GONNA BE A HARD PILL TO SWALLOW.
PSSST... IT'S A SUPPOSITORY


Merry Christmas From The Johnson's

**From:** Baldwin, Alaina [mailto:Alaina.Baldwin@seterus.com]
**Sent:** Tuesday, December 27, 2011 8:01 AM
**To:** Doane, Jodi R.; 'Debbie Cole'
**Subject:** FW: Merry Christmas from the Johnson's!

---

This e-mail message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance and it is not intended to be all or part of an agreement.

---

**Bishop, Cheryl D.**

**From:** Devlin, Bradford L.
**Sent:** Wednesday, October 14, 2009 10:30 AM
**To:** Seattle V
**Subject:** FW: Two Quotes to Ponder:

## *Two Quotes to Ponder:*

**"Life's tough......it's even tougher if you're stupid."**
**-- John Wayne**

**"My friends, we live in the greatest nation in the history of the world. I hope you'll join with me as we try to change it."**
**-- Barack Obama**

**Unfortunately, now we are beginning to understand what the second quote means...**
**...and what the first quote says about us.**

**Bishop, Cheryl D.**

**From:** Devlin, Bradford L
**Sent:** Monday, August 31, 2009 9:45 AM
**To:** Seattle V
**Subject:** FW: Morality Test

Tough decision...

**Subject:** Fwd: Morality Test

# BE HONEST ...

# TEST OF MORALITY

# The One (1) Question Test

**Please scroll down slowly and give due consideration to each**

**line.**

**<u>THE SITUATION:</u>**

You are in *Florida, Miami* to be specific. There is chaos all around you caused by a hurricane with severe flooding. This is a flood of biblical proportions. You are photojournalist working for a major newspaper, and you're caught in the middle of this epic disaster. The situation is nearly hopeless.

You're trying to shoot career-making photos. There are houses and people swirling around you, some disappearing under the water. Nature is unleashing all of its destructive fury.

**<u>THE TEST:</u>**

Suddenly you see a man and a woman in the water. They are fighting for their lives, trying not to be taken down with the debris. You move closer. Somehow they look familiar. You suddenly realize who they are. It's *Barack Obama* and *Nancy Pelosi*! At the same time you notice that the raging waters are about to take them under forever. You have two options: You can save their lives or you can shoot a dramatic *Pulitzer Prize* winning photo, documenting the deaths of two of the world's most powerful people.

---

**<u>THE QUESTION:</u>**

Here's the question, and please give an honest answer...

Would you select high contrast color film, or would you go with the classic simplicity of black and white?

**From:** Devlin, Bradford L.
**Sent:** Thursday, December 10, 2009 9:00 AM
**To:** Seattle V
**Cc:** Bishop, Cheryl D.; Stewart, Michael B.
**Subject:** Chatter

Recently, I've heard chatter and rumblings concerning myself and other members of the Gang Group regarding personnel, vehicle assignments, and other personal matters. This chatter has progressed to outlying offices and must come to a stop. Chatter of this nature is not productive and is often offensive, and often not true.

If any of you have questions or concerns regarding another employee, please go to that employee first to reconcile any differences. If your problem is not resolved, feel free to come by and discuss the matter with me.

Thank You.

Brad

**Bishop, Cheryl D.**

**From:** Bishop, Cheryl D.
**Sent:** Sunday, December 13, 2009 3:43 PM
**To:** Levingston, Robert M.
**Cc:** Devlin, Bradford L.
**Subject:** Office incident

To: ASAC Robert Levingston

From: Cheryl D. Bishop

RE: Office Incident

On December 11, 2009, at approximately 1:15PM, I verbally advised you of an office incident involving Seattle Group V Supervisor Brad Devlin and myself. The following is submitted to document the details of that incident:

On December 11, 2009, at approximately 1:00PM, I contacted GS Devlin in his office to inquire about the below attached email. I asked GS Devlin if we could talk about the email and what he might have been referencing. GS Devlin replied in an angry tone; "It's none of your business". I asked GS Devlin why he had copied me on the email as a recipient if it didn't concern me. GS Devlin stated he had copied me on the email "as a courtesy". I told GS Devlin that I didn't understand what that meant and had come to talk to him since his email had indicated he was open to discussion. GS Devlin again stated "it's not your business". I again replied that I didn't understand why it was none of my business if he included me in the email. GS Devlin then abruptly stated "get the hell out of my office!" I kept my voice even and again asked GS Devlin what he was talking about and why wouldn't he discuss the email. GS Devlin then suddenly stood up and walked aggressively around his desk and quickly toward me. I did not move and remained standing in front of his desk. GS Devlin stopped inches from my face and starred at me. It is my belief that it was either GS Devlin's intention to engage in a physical confrontation or attempt to intimidate me by demonstrating an aggressive posture. In a neutral voice I told GS Devlin that I was simply asking a question. GS Devlin then turned away from me and sat back down in his chair. I again told GS Devlin that I was only asking because I did not understand his email or his reference to "chatter". GS Devlin then threw up his arms and said; "what do you want from me Cheryl?!" I replied that I wanted to discuss the email. GS Devlin again stated "it's none of your business". I then left GS Devlin's office without further interaction.

Cheryl D. Bishop
Public Information Officer
ATF Seattle Field Division
O# 206-389-5859
C# 206-255-5981

**Bishop, Cheryl D.**

**From:** Bishop, Cheryl D.
**Sent:** Thursday, April 21, 2016 1:59 PM
**To:** Devlin, Bradford L.
**Subject:** Re: Disparaging Remarks?

You know nothing about me - you were not even with this agency when I was working undercover and running complex street investigations - including the first multi dependent ATF T-III RICO gang investigation initiated in Washington that originated from the murder of an FFL. You don't know me. And I don't want you to. What I'm requesting is that you keep the unprofessional personal disparaging commentary to yourself.

Sent from my iPhone

> On Apr 21, 2016, at 1:01 PM, Devlin, Bradford L. <Bradford.Devlin@atf.gov> wrote:
>
> Although I have no idea what you are talking about, I think this is very interesting. I have been asked about your experience as an ATF agent by the AUSA's here in Eugene because they heard you were going to be the next RAC. We do have an unfortunate history but I have not disparaged you to anyone. I did tell one AUSA that I thought you had very little street experience. I gave them my opinion. You probably disagree but I don't care. It is true that your work abilities and character do speak for themselves; our reputations in law enforcement are our most important commodity. I hope others will see that you are a genuine, hardworking and competent agent.
>
> Brad
>
> -----Original Message-----
> From: Bishop, Cheryl D.
> Sent: Thursday, April 21, 2016 12:24 PM
> To: Devlin, Bradford L. <Bradford.Devlin@atf.gov>
> Subject: Disparaging Remarks?
>
> Brad -
>
> I've never been fond of rumor mills - and am old enough to understand the importance of going directly to the source. But it has come to my attention that you've reportedly been making disparaging remarks about me and my qualifications if I were to put in for the RAC position in Eugene.
>
> I tend to stand by the belief that people should form opinions of others for themselves and that who I am as a person, my work abilities and character will speak for itself. I might think you're a jerk - but it would not be my place to try and convince others of that - they should judge you for themselves.
>

> If is true that you've been engaged in making disparaging commentary about me - and comments to the effect that I lack the professional qualifications and would be a "train wreck" for the Eugene office - then I'd appreciate it if you would stop. And If it is your goal to somehow taint the image of me to other agents, especially the cadre of new young impressionable agents coming in, as well as other agency representatives - then your actions do nothing but a dis-service to not only me both personally and professionally - but the image of our agency as well.
>
> Despite the negative history between us - If you feel you have something you'd like to talk about or say to me directly - or express your opinion on my abilities - or lack of in your view - or why you feel I should not be the RAC in Eugene (or anywhere else for that matter) - my cell is always on.
>
> If the information I've received is incorrect - then I'd appreciate knowing that as well.
> Sent from my iPhone

2

# EXHIBIT 7c

**Bishop, Cheryl D.**

**From:** Nunez, Celinez
**Sent:** Wednesday, June 15, 2016 2:51 PM
**To:** Bishop, Cheryl D.
**Subject:** FW: TDY - K9 Clarification

FYI

-----Original Message-----
From: Nunez, Celinez
Sent: Wednesday, June 15, 2016 2:52 PM
To: Dawson, Doug R. (Douglas.Dawson@atf.gov) <Douglas.Dawson@atf.gov>
Subject: FW: TDY - K9 Clarification

Doug,

I spoke with SACH Cheryl Bishop regarding the latest development on HQ's decision not to allow K9 Allegra to go on a one year TDY and remain in service. She has brought up some very good questions that I think deserve some answers and clarification (please refer to the below email for those questions). As you know I'm a big advocate for both SACH Bishop and K9 Allegra because of the amazing hard work they do every day for the SFD and our CGIC partners. I cannot lie, I'm disappointed that K9 Allegra will be made to retire if SACH Bishop decides to continue with her TDY. I personally have made arraignments with the Seattle PD to ensure that their K9 cover our CGIC task force operations during SACH Bishop absence. I did not think this would be an issue, especially when she was told from the inception of this TDY proposal that she could keep K9 Allegra in service. I get that we have to look at the bigger picture and perception, but in light of this being the 11th hour of this news, I think we owe it to SACH Bishop to make some concessions to this new rule.

In the past, we were looking at putting two K9s in SFD because of the large geographic area we cover and the success of our CGIC program. With the recent creation of the CGIC in Tacoma, Washington, I think we can easily justify adding an additional K9 to this division. My question to you is, if we send an agent through the March K9 class can we recertify, or send SACH Bishop through as well when she gets back from her TDY?

SACH Bishop needs to make a decision here soon considering she has tenants slate to rent her house. Can we get an answer to these questions as soon as possible?

Thank you,

Celinez Nunez
Assistant Special Agent in Charge

Seattle Field Division
Mobile: 202-341-6674
Office: 206-204-3208

-----Original Message-----
From: Cheryl Bishop [mailto:bishopcheryl25@gmail.com]
Sent: Wednesday, June 15, 2016 2:01 PM
To: Nunez, Celinez <Celinez.Nunez@atf.gov>
Subject: TDY - K9 Clarification

Celinez -

As follow-up to our conversation:

Based on initial approval of the TDY with OST and guidance that K9 Allegra would be permitted to remain in service - I made travel plans with HQ and formal arrangements to rent out my house.

The official TDY MOU (July 10th, 2016 - July 7th, 2017) has been signed and lodging in DC has been secured. In lieu of today's sudden developments and new advisory that K9 Allegra will not be permitted to remain in service and must be retired if I were to proceed with the TDY - can you please provide answers to the following questions:

1. As you advised - after the TDY and upon my return to SFD I would resume my duties as an EDC handler. Can Allegra be reinstated via recertification testing by NCD upon my return? Allegra is 4 1/2 years old, our proven body of work illustrates she is an exceptional detection canine - passing a recertification and explosives odor test would not be an issue.

2. My travel plans called for driving the K9 GOV from Seattle to DC with a small u-haul trailer. Will continued use of this vehicle be permitted.

Thank you,
Cheryl

# EXHIBIT 7d

I think once you speak to Beesley you will be in a better position to make a decision

Sun, Jun 19, 10:54 AM

Hi Cheryl, I know you're still trying to make your decision on what do with your TDY. Just to give you heads up, according to Doug, if we get a second Dog it will be for Portland, which makes sense since we are starting the CGIC there.

If we get the a March class the only spot you will be looking at upon

June 19th, 2016

Hi Cheryl, I know you're still trying to make your decision on what do with your TDY. Just to give you heads up, according to Doug, if we get a second Dog it will be for Portland, which makes sense since we are starting the CGIC there.

If we get the a March class the only spot you will be looking at upon your return will be Portland

I want to give you everything that might play out in order for you to make an informed decision

Wed, Jun 29, 12:12 PM



Are you around?

I'm in Main Justice this week. About to take a break from the class. Wanted to talk to you regarding your status of your TDY?

I'm around - free now for call

Yes

Celinez - please let Dawson known - yes, I am still interested in the TDY but am waiting to hear back from AD

break from the class. Wanted to talk to you regarding your status of your TDY?




Yes

Celinez – please let Dawson known – yes, I am still interested in the TDY but am waiting to hear back from AD Beasley who advised me to wait because he wished to confer again with AD Gleysteen.

Delivered

I will let him know

# EXHIBIT 7e

**Bishop, Cheryl D.**

**From:** Bishop, Cheryl D.
**Sent:** Saturday, July 09, 2016 12:50 PM
**To:** Brandon, Thomas E.
**Subject:** Can We Do Better?

Dear Deputy Director Brandon,

I hope you will forgive my writing to you directly – but I felt overwhelming compelled to do so. Like many of us, I find myself struggling in recent days with emotions; anger, sadness, frustration. I weep for current tragic events and the state of tensions as our Country and communities grapple with issues of race relations and bias. You recently attended training on "implicit" bias and how it can affect decisions. But I am writing to ask - what about "explicit" bias? What impact does *it* have? How do we make decisions in ATF when addressing bias - and perhaps most important – what is the impact and perception of those decisions? I'd like to give you the following - and "if" you can imagine that you are the employee – I'd like to simply ask for your feedback on how "you" might **feel:**

- A white supervisor sends derogatory emails that make fun of blacks and other ethnic minorities. The black employee turns to management with their concerns. The supervisor receives no disciplinary action.

- The white supervisor threatens the black employee with physical violence – the employee again turns to management. The employee is removed from the group, reassigned to an undesired position and the supervisor is given a payed move to an office of preference.

- The white supervisor displays a Nazi Swastika tattoo and laughs at the black employee who sees it. The employee once again turns to management to express dismay and disgust. The supervisor tells his boss the tattoo is for undercover – the matter is dropped.

- The white supervisor makes false defaming statements about the black employee to other enforcement agencies and US Attorney's Office. The employee again turns to management. The employee is told the supervisor was spoken to but no further action is taken.

At this point – if you were the employee – how would you feel? Would you perceive your organization takes bias seriously? What does the response, decisions and actions of your leadership convey?

You learn the supervisor is going to work in internal affairs for subsequent promotion. You learn management is supportive of it. How would you perceive that?

You decide to send a written summary detailing the pattern of bias harassment. And you wait for an agency response. Two months go by – no one officially acknowledges the complaint although you know it was received. No on offers assurances it will be investigated. What would you think? Would you feel the agency cares?

After you send your summary – you find out there are suddenly conditions and stipulations added to a previously approved temporary detail and promotion. You are excited about the opportunity – you are hardworking and consistently receive outstanding performance ratings – you feel this might be a significant opportunity for career advancement. But amongst several new conditions is a requirement that upon your return, if you wish to have the option of continuing in your previous duties, you must relocate to an office close to the supervisor you complained about. Would you feel supported? Or feel punished?

You are told there are concerns about the "optics" of your detail. But no one expresses concern about the "optics" of the long pattern of harassment and bias. No one expresses concern about the optics of a supervisor sending racially derogatory emails without consequence – or the optics of a supervisor threatening an employee with physical violence only to be ultimately rewarded. How about the optics of a supervisor, a representative of agency leadership – who displays a tattooed symbol of racial hate? How should you, or any employee for that matter, feel knowing they work alongside someone with ***that*** beneath their badge? Beneath the same badge you proudly carry - beneath the same agency uniform you proudly wear?

I started my inquiry with asking how ***you*** would feel. I know how I do. I'm saddened and angered by our Country's current state and grappling's with race relations...but I'm just as frustrated and angry with our own agency. The President has said as a Nation we can do better. The Attorney General has said we can do better. I only pray the same might also hold true for ATF.

Thank you for taking the time to read this.

# EXHIBIT
# 7f

**Bishop, Cheryl D.**

**From:** McCrary, Daryl R.
**Sent:** Friday, July 15, 2016 8:57 AM
**To:** Bishop, Cheryl D.
**Subject:** Re: Clarification

SA Bishop,
Thank you for the additional information. In a mtg now, but I will follow up.

Daryl R. McCrary
DAD OPRSO
(202) 648-7004 Desk
(202) 384-4861 Cell

> On Jul 15, 2016, at 10:59 AM, Bishop, Cheryl D. <Cheryl.Bishop@atf.gov> wrote:
>
> DAD McCrary -
>
> Thank you for speaking with me the other day. Just to recap in regards to the TDY:
>
> Just before I was scheduled to leave for DC I was told that if I proceeded with the detail I would have to; immediately retire my K9, repeat K9 school, sign a new 5 year K9 commitment and then move to Portland. The requirements were surprising and came after I filed the complaint regarding RAC Devlin. The MOU with OST had already been signed and I had been told that maintaining the K9 during the TDY was approved by HQ and not an issue.
>
> I very much wanted the TDY - but was told I had to make an immediate decision - before I could confer with AD Beasley - so I withdrew because of the sudden consequences.
>
> I wanted to clarify hoping to eliminate any confusion.
>
> Thank you again
>
>
>

# EXHIBIT 7g

**Bishop, Cheryl D.**

**From:** Beasley, Roger L.
**Sent:** Monday, July 18, 2016 12:21 PM
**To:** Bishop, Cheryl D.
**Subject:** RE: TDY - OST

Cheryl – I'm not sure how I missed this other than "I've been out" for the last couple of weeks on personal/business travel. My apologies!

I am sorry to hear that this isn't going to work out. I was looking forward to meeting you AND your partner. I understand the impact that this decision would have had on you and her so I completely respect your decision. I'm sorry it has come to this. I think you would have been a valuable part of the OST team just as you currently are to the FO team.

If there is anything I can ever do to help, please don't hesitate to ask. I also look forward to meeting you in person next time I come to Seattle or you come to HQ.

R

**From:** Bishop, Cheryl D.
**Sent:** Thursday, June 30, 2016 12:51 PM
**To:** Beasley, Roger L. <Roger.Beasley@atf.gov>
**Cc:** Frande, Francis H. <Francis.Frande@atf.gov>; Dawson, Doug R. <Douglas.Dawson@atf.gov>; Nunez, Celinez <Celinez.Nunez@atf.gov>
**Subject:** TDY - OST

Dear AD Beasley,

I want to sincerely thank you for the tremendous opportunity of a TDY with OST. Regrettably, the unanticipated added stipulations impacting the TDY necessitated I reevaluate the potential best path forward in my continued efforts for career advancement. I believe deeply that my broad experience with ATF and in the private sector with Amazon.com would have been an excellent fit for assisting you and OST in furthering ATF's mission. However, in order to promote upward (GS15) an agent must complete two years as a permanent GS14 first line supervisor. I am currently 52 years of age and have not yet met this requirement. It is my goal to promote upward while continuing to offer as much value as possible to the agency before I retire. With the limited time left before I am mandatory – I believe my best chance for any measurable upward advancement with ATF is to again pursue a group supervisor position, complete the required two years – then seek potential available opportunities in HQ.

I want to apologize for any inconvenience this may have caused. I know your staff spent time on logistics while you and Acting DAD Frande both spent valuable time speaking with me and vetting me for the position. I am grateful to A-DD Turk for his support in initiating the outreach – and to you for offering me the

opportunity. I was inspired during our conversations by not only what you conveyed as your vision, expectations and goals—but also by your ***genuine*** passion and sincere desire to improve communication and services – especially for agents and those in the field. If there is ever anything I can do to assist you I am at your service - please do not hesitate to ask.

Please convey my appreciation to AD Gleysteen and A-DD Turk for their support and patience as I sorted through my decision. Thank you again for your time and the initial proposed opportunity.

Respectfully,

Cheryl